185 N.J. Super. 258 (1982)
448 A.2d 481
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
IRA S. SANDERS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 14, 1982.
Decided June 21, 1982.
*259 Before Judges ALLCORN, FRANCIS and MORTON I. GREENBERG.
Nicholas F. Moles, Assistant Atlantic County Prosecutor, argued the cause for appellant (Joseph A. Fusco, Atlantic County Prosecutor, attorney; Joseph D. Coronato, Assistant Prosecutor, on the brief).
Mark E. Roddy argued the cause for respondent (Goldenberg, Mackler & Sayegh, attorneys).
Irwin I. Kimmelman, Attorney General, attorney; Robert B. Sturges, Deputy Director, and Kevin F. O'Toole, Deputy Attorney General, filed a brief for amicus curiae State of New Jersey, Department of Law and Public Safety, Division of Gaming Enforcement.
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
Pursuant to leave granted, plaintiff appeals from an order dated November 23, 1981 suppressing evidence obtained from defendant as the result of a warrantless search conducted September *260 3, 1981. This order reflected the motion judge's decision in an opinion dated December 11, 1981, after he signed the order.
The facts on this matter were developed at an evidential hearing held on November 20, 1981 on defendant's motion to suppress. There were two witnesses at the hearing: Richard Martin, a security officer employed by Caesars Boardwalk Regency Casino Hotel, an Atlantic City casino hotel, and John Wild, a New Jersey state trooper, assigned at the time of the search and seizure to the casino investigation enforcement section in Atlantic City within the Division of Gaming Enforcement of the Department of Law and Public Safety. At the outset of the hearing the motion judge stated that he presumed that since the search was warrantless, the State had "the burden of going forward." The assistant prosecutor acquiesced in this statement. Consequently, Martin and Wild were called as witnesses by the State and were cross-examined by defendant's attorney.[1]
The facts are not at all complicated. At about 4 p.m. on September 3, 1981 defendant was playing blackjack at Caesars. Martin, who was then a plainclothes sergeant in Caesars' security force, was instructed by Shumsky, Caesars' games manager, to eject defendant from Caesars' premises. Shumsky gave this direction because defendant was thought to be a card counter. Martin and two uniformed security officers went over to the table where defendant was playing. They asked defendant to come with them and cash in his chips. Defendant then went to a cashier's cage and cashed in his chips. Defendant caused the security personnel no trouble then or, indeed, as far as the *261 record shows, at any time. Martin then asked defendant to come to a holding room with him and the two uniformed men. While the record indicates that the request was not an unequivocal direction, there is no suggestion that defendant was told that he did not have to comply with the request. The reason that defendant was taken to the holding room was so that information could be obtained from him with respect to his identity. This information is obtained because, as explained by Martin, "[o]nce a person is ejected, he is not permitted back in the premises. So we have a file we keep in our office so if the person does come back, we have a record."
When defendant was taken into the holding room he was subjected to a "pat down" search. The purpose of the search was to determine if defendant was armed. Martin conceived that the search was the "proper procedure." In defendant's left front pocket Martin felt a square object. He reached into defendant's pocket to find out if the object was a weapon. It in fact was one of a pair of dice with a spoon on it. Martin also pulled out a small glass bottle. Martin thought that the contents of the bottle was cocaine. The record indicates that until this discovery was made no public employee was involved with defendant. It is also clear that absent the finding of the substance, no public employee would have become implicated in the matter.
Because of the discovery of the bottle, Martin determined to alert the State Police. At the time that the bottle was found, Wild was just outside the holding room. The record is not completely clear as to why Wild was at that location. It does show that at about the time that defendant was being taken to the holding room Wild had been talking to a Lieutenant Pacentrilli on the Caesars' security force. Pacentrilli was apparently notified by radio that defendant was being ejected. Pacentrilli then went to a spot just outside of the security room. Wild went to the same place, but separately. There is not the slightest suggestion in the record, however, that Wild or any other public officer or employee directed that defendant be *262 taken to the holding room, searched or ejected. Nor does the record reflect that Wild knew that defendant was being searched. Indeed, the record does not even directly show that Wild knew that defendant or anyone else was being taken to the holding room.
Nevertheless, Wild was given the bottle. When he looked at it he thought that it contained cocaine. Defendant, Wild and Martin then went to Wild's office for the purpose of running a field test for cocaine. The test proved positive. Thereupon defendant was arrested. On October 1, 1981 defendant was indicted for possession of cocaine. N.J.S.A. 24:21-20a(1).
On this record the motion judge suppressed. The judge concluded that the search and seizure performed by Martin was unlawful. In reaching this conclusion he indicated that there was no probable cause to believe that defendant had been or was about to engage in any criminal activity. Further, the judge ruled that defendant was no real threat to the officers' safety.
The more substantial issue confronting the motion judge was whether the search and seizure was at all subject to constitutional limitations. The reason for the doubt on this issue is that defendant was taken to the holding room and searched by Caesars' employees rather than the State Police. No regularly employed public employee became implicated in the matter until the bottle with the cocaine was given Wild. The judge recognized that constitutional protections against unreasonable searches and seizures are generally inapplicable to searches performed by private parties. Thus, the exclusionary rule is not applicable to private searches and seizures.
The judge stated, however, that private searches and seizures have been recognized in some circumstances as involving such sufficient aspects of state action as to be held subject to constitutional restrictions and thus the exclusionary rule. In reaching this conclusion he cited State v. Droutman, 143 N.J. Super. 322 (Law Div. 1976). He noted that in Droutman the judge specified three situations in which state action could be found in the *263 context of apparently private searches. In the first situation joint participation between private citizens and police officers would bring the conduct within the constitutional restrictions. 143 N.J. Super. at 328. In the second situation, if the State has significantly involved itself in the illegal search, its fruits may be suppressed. 143 N.J. Super. at 330. A third situation in which the fruits of a seemingly private search may be suppressed is when the private conduct is sufficiently fostered or encouraged by the police or other law enforcement agency. 143 N.J. Super. at 332.
The judge in this case laid the facts against the Droutman tests and ruled that the facts did not show there had been joint public-private participation in the search. He ruled, however, that because of the second and third aspects of the tests, state action was involved. He pointed out that each casino was mandated to have a security department and that the security personnel were empowered to enforce the law and to detain persons suspected of violating the law. See N.J.S.A. 5:12-99; N.J.S.A. 5:12-121; N.J.A.C. 19:45-1.11(c)(7). The judge indicated that the State had conferred powers upon casino personnel far in excess of those possessed by private individuals or security guards and that the powers
... are virtually equivalent to those granted to the police, rendering casino security personnel de facto agents of the State when exercising these powers. At present, under the State's theory, any person in a hotel-casino who is suspected of an infraction or offense, criminal or otherwise, can be detained and searched with impunity by casino security. And while such conduct would be illegal on the part of duly constituted State or local police officers, it is not for casino security personnel due to the purported absence of state action.
It is the opinion of this court that the pervasive regulation over casino security departments and personnel, with the enhanced power it confers, constitutes sufficient involvement or encouragement by the State as to be state action within the purview of Droutman. While this factual setting may be novel by way of appellate decision in this State, its rationale finds support in the case law of other jurisdictions, which holds to the effect that similar extensive state regulation over private security officers, and the granting of enhanced police type powers constitutes state action, rendering the Fourth Amendment and the exclusionary rule applicable.
*264 Our initial inquiry is whether the search and seizure was lawful, for clearly if they were lawful, then it would not matter whether state action was implicated. On this point we need not long be detained. In Uston v. Resorts International Hotel, Inc., 89 N.J. 163 (1982), the Supreme Court ruled that as of the time of its decision card counting was lawful and that a casino could not eject a patron simply because he is a card counter. The court further noted that the Casino Control Commission had not adopted any rule ordering or approving the exclusion of card counters. Since the Supreme Court had ruled on May 5, 1982, and defendant was apprehended on September 3, 1981, it is beyond any dispute that defendant was lawfully on Caesars' premises and could not be properly ejected for his conduct. It is further clear that Caesars' employees used coercive measures to take defendant to the holding room and that this conduct was unlawful. Martin, of course, characterized his directions to defendant as not being mandatory. Further, he indicated that defendant did not have to go to the holding room. But it is manifest from his testimony that he never told defendant that he did not have to go to the holding room. See State v. Johnson, 68 N.J. 349, 353, 354 (1975). Thus, defendant was confronted with three security personnel from Caesars, two uniformed, and requested to go to the room. Further, he was on Caesar's premises. If defendant was under no compulsion, then surely such an overwhelming force was not needed. One person would have been sufficient to present defendant with an option. We are satisfied from our review of the record that there is not the slightest question but that Caesars' employees intended to coerce defendant to go to the holding room so that he could be improperly ejected from the premises.[2]
*265 It is further obvious that there was no basis for the pat-down. Defendant was on the premises to play cards. Caesars' security men did not have any reason at all to believe that he was armed or otherwise dangerous. In the absence of at least some basis for suspicion to believe he was armed, the pat-down, which was not incidental to a lawful arrest or detainment, would have been unlawful even if conducted by a police officer. See State v. Lakomy, 126 N.J. Super. 430 (App.Div. 1974). In summary, we conclude that defendant was unlawfully being ejected from the premises, was unlawfully taken to the holding room and unlawfully searched. By any standard, the product of such a search was unlawfully obtained.
Our inquiry must therefore be whether the unlawful conduct of Caesars' employees should result in evidence produced by such conduct being excluded. We see no reason to reach such a conclusion. As already noted in State v. Droutman, supra, 143 N.J. Super. at 322, the judge specified three circumstances in which a seemingly private search and seizure may involve such sufficient state action as to implicate the exclusionary rule. The circumstances specified in Droutman are: when there is joint participation between private citizens and police officers, when the State has significantly involved itself in the illegal search, or when the private search was sufficiently fostered or encouraged by the State. In United States v. Clegg, 509 F.2d 605 (5 Cir.1975), the court described the test of when governmental activity would implicate the exclusionary rule as follows:
It is only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure which the government itself, under the circumstances, could not have undertaken that the problem discussed in United States v. Mekjian, 505 F.2d 1320 (5th Cir.1975) arises. Preknowledge and acquiescence make a search by a private party a search by the government. Fourth Amendment standards must be complied with. Any evidence which, for Fourth Amendment reasons, would have been excluded had it been gathered by the government pro se would, of course, have to be excluded if gathered by the only nominally private party. It would be excluded with the aim of deterring the government from further attempts to utilize knowingly the services of a private party to do for it that which it is forbidden to do for itself. [at 609]
*266 In United States v. Mekjian, 505 F.2d 1320 (5 Cir.1975), the court announced as follows:

Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 has made it clear that the fourth amendment was intended as a restraint on the activities of the government and its agents and is not addressed to actions, legal or illegal, of private parties. Where no official of the federal government has any connection with a wrongful seizure, or any knowledge of it until after the fact, the evidence is admissible. See United States v. Harper, 7 Cir.1971, 458 F.2d 891, cert. denied, 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132; United States v. McGuire, 2 Cir.1967, 381 F.2d 306, cert. denied, 389 U.S. 1053, 88 S.Ct. 801, 19 L.Ed.2d 848; Barnes v. United States, 5 Cir.1967, 373 F.2d 517. No objection, therefore, has been raised or could be raised as to the admissibility of any records copied before the initial contact of Mrs. Jones with BS.
A much more difficult issue arises once the government is contacted. The fourth amendment is given a generous interpretation in order to insure that its safeguards are not evaded by circuities. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. Fourth amendment protections can be effectively undercut by the intervening agency of non-governmental individuals. Accordingly, where federal officials actively participate in a search being conducted by private parties or else stand by watching with approval as the search continues, federal authorities are clearly implicated in the search and it must comport with fourth amendment requirements. [at 1327].
Our review of the record convinces us that there is no basis to find state action so as to require us to exclude the evidence on any basis. The trial judge made a finding that there was no joint participation in the search. We see no reason not to accept this factual finding which is fully supported in the record. See State v. Johnson, 42 N.J. 146, 161-162 (1964). As already noted, the entire process leading to the discovery of defendant's possession of cocaine was put in motion and executed by Caesars' employees. There was no showing that Wild or any other state employee was aware of the situation concerning him. Wild became involved only after the search and seizure had been completed. Thus, Wild did not participate in the search. Nor was there such a preknowledge and acquiescence in Caesars' actions by Wild or any other public employee that Martin could be characterized, in the term of United States v. Clegg, 509 F.2d at 609, as "only [a] nominally private party." Martin and the other two security men were acting completely for their employer. *267 When they took defendant to the holding room they in no sense were doing the State's bidding. Quite to the contrary, they had not the slightest reason to believe that defendant was violating any statute or regulation of the State or any of its subdivisions or agencies. Defendant was being ejected only because it was feared by Shumsky that he would be successful in winning money. That was a private matter between defendant and Caesars.
Finally, we can find no basis for the motion judge's conclusion that the State was involved in the illegal search or fostered or encouraged it. The Casino Control Act does require that the casino establish detailed security procedures. N.J.S.A. 5:12-99. Further, the act specifies that the casino must have procedures governing the utilization of its private security force and that the employees of the casino may question any individual reasonably expected of violating certain sections of the Casino Control Act. N.J.S.A. 5:12-99(a)(14); N.J.S.A. 5:12-121(a). Further, the casino employees may take into custody any person in a reasonable manner for a reasonable time if they have probable cause to believe the person is violating these sections. N.J.S.A. 5:12-121(b). But these powers to question and arrest are limited to situations in which the patron is thought to be involved in various forms of unlawful activity. N.J.S.A. 5:12-113 to N.J.S.A. 5:12-116. The limited extent of these powers is emphasized in N.J.A.C. 19:45-1.11(c)(7)(vi), which authorizes "[t]he detainment for probable cause of persons that may be involved in illegal acts for the purpose of notifying law enforcement or Commission authorities." There is nothing in the Casino Control Act or the regulations adopted pursuant thereto that authorized the conduct of Caesars' employees in this case. When Caesars acted to eject defendant it was pursuing nothing but its private interests. In the circumstances its conduct *268 cannot be imputed to the State, and thus the substance seized from defendant shall not be excluded from admission into evidence at any ensuing trial on the ground that it was illegally seized.[3]
Finally, we note that defendant may not be without other remedy. When the exclusionary rule was extended to the states in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Supreme Court of the United States was in part motivated by the futility of a trespass remedy against the offending officers. See 367 U.S. at 670, 81 S.Ct. at 1699, 6 L.Ed.2d at 1099 (Douglass, J., concurring). Here the search and seizure was by private persons. We are by no means certain that a tort action against them and their employer would be doomed to failure.[4] From Caesars' viewpoint, a tort remedy would be more of a restraint on its activity than would be an order for suppression. On the other hand, we cannot perceive of how such an order could in any way discourage future unlawful action by any public officer since no public officer was involved in the search and seizure.
The order of November 23, 1981 is reversed and the matter is remanded to the Superior Court, Law Division, Atlantic County, for further proceedings not inconsistent with this opinion.
NOTES
[1] Ordinarily, since a search without a warrant is prima facie invalid, the burden of proof is on the State to justify such a search. See State v. Welsh, 84 N.J. 346, 352 (1980). The motion judge simply applied this usual rule. We have some doubt, however, as to its applicability in a case in which the search prima facie was private. But we do not reach the issue since there were no disputed issues of fact in the Law Division. From our review of the record we are satisfied that there were no significant credibility questions. We decide this case on the assumption that the State has its usual burden.
[2] The motion judge indicated that based upon his "perception of the witnesses and testimony, it is the court's opinion that defendant was directed or ordered to accompany the security officers to the holding room." But he made no definitive determination of the issue. We see no reason not to exercise our original jurisdiction and state the obvious. N.J.Const. (1947), Art. VI, § V, par. 3; R. 2:10-5.
[3] We do not imply that we would have reached a different result if defendant had been taken to the holding room because of alleged unlawful conduct. That situation is simply not before us.
[4] Of course, we do not suggest that the findings here would be binding in any such later civil action. It would be for the court in that case to determine what effect, if any, the determinations made here should be given. We point out that neither Caesars nor its employees are parties here.