224 N.J. Super. 21 (1988)
539 A.2d 744
NEIL SCHWARTZ, PLAINTIFF-APPELLANT,
v.
LEASAMETRIC, INC., A CORPORATION OF THE STATE OF CALIFORNIA, AND JAMES BROWN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 1, 1988.
Decided March 23, 1988.
*22 Before Judges SHEBELL, GAYNOR and ARNOLD M. STEIN.
Vaccaro, Osborne, Curran & Murphy, attorneys for the appellant (Katherine G. Houghton, on the brief).
Beattie, Padovano, Breslin, Dunn & Kafafian, attorneys for the respondents (Roger W. Breslin, Jr., of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiff Neil Schwartz appeals the dismissal on summary judgment of his suit against defendants Leasametric, Inc. and James Brown for wrongful termination and slander. We affirm the dismissal of his slander claims but reverse the summary judgment entered on his wrongful termination claims.
*23 The first and fourth counts of plaintiff's complaint alleged that Brown, an agent of Leasametric, slandered plaintiff. Plaintiff alleged that Brown spoke to him "in [such] a manner as to embarrass and harass the plaintiff in front of his fellow workers" and "to give the impression that the plaintiff was dishonest and not trustworthy." Plaintiff alleged that these remarks "injured his good name, character and reputation, and brought [him] into public scandal, infamy and disgrace." In count two, plaintiff alleged that Leasametric "had a set procedure for informing employees of problems existing in their employment, and had a set procedure for termination," and that this procedure was not followed in his case. In the third count, plaintiff alleged that he was entitled to the return from Leasametric of his company car ("a new General Motors Monte Carlo") or damages equal to its value, "due to the fact that this was part of his compensation which he was offered in his employment with defendant corporation." The fifth count repeated the wrongful termination allegation from count two and demanded damages from Brown.
Brown and Leasametric contend that plaintiff's employment was terminated for insubordination to a supervisor and defend on the following grounds: (1) as an employee at will, plaintiff's employment was subject to termination at any time with or without cause; (2) the termination did not violate any expressed public policy, and (3) plaintiff's insubordinate conduct toward a supervisor constituted just cause for termination.
The facts, viewed most favorably to plaintiff, are as follows. By letter dated January 12, 1981, Leasametric offered plaintiff the position of "Senior Account Representative, Test Instruments." Plaintiff was to receive salary, quarterly performance bonuses and a company car. The letter also stated that he would be given "an employees and benefits handbook."
Leasametric's policy manual provided the following three-step procedure for disciplining poor job performance or minor acts of misconduct which applied to all employees:

*24 A. Normal Disciplinary Procedures
The progressive disciplinary procedure is used to correct poor job performance or minor acts of misconduct. The procedure has three phases, for which a date must be set for the correction of each problem. They are as follows:
Phase 1  Verbal Counseling Session, with memo to file.
Phase 2  Second Counseling Session, with memo to file.
Phase 3  Recommendation for termination through your Department Manager and Personnel Manager.
The manual further indicated that certain acts were grounds for immediate termination:
The company would like to foster an environment which is professional, cooperative, kind, and friendly, therefore, even relatively minor misconduct which detracts from this atmosphere, may be grounds for immediate termination. Depending upon the severity of the act of misconduct, employees may be subject to discipline or immediate termination ... due to:
....
Insubordination
....
This is not exhaustive. Supervisors should exercise their discretion in deciding to recommend discipline for other types of employee misconduct.
The manual also indicated that disciplinary procedures could be accelerated, and that "[s]evere situations may require immediate termination or acceleration." In these severe situations, the manager was instructed to "contact the Personnel Manager to determine appropriate action."
Plaintiff started working for Leasametric in January 1981. His first immediate supervisor gave him a positive evaluation. After his first supervisor left the company, a second supervisor of three or four months also gave plaintiff a positive evaluation on December 11, 1981. Defendant Brown took over as sales manager in late January 1982.
Plaintiff testified that from January up until June 1982, he had "[n]o difficulty" with Brown, and plaintiff did not detect any "hostility" or "bad feeling[s]." On about June 18, 1982, plaintiff detected a change in Brown's attitude which emanated "from a policy that was construed to mean let's get rid of *25 anybody who's making any kind of money in this company one way or another." Leasametric allegedly was firing first those employees making the most money, and plaintiff was next in line. Plaintiff testified that the following discussion alerted him to Brown's change in attitude:
He just called me in as we were walking by the hall. Nothing led up to it.... He came over to me in front of Ed Elber's office and said if you would like to leave the company, I will give you a letter of recommendation and I said to him, "Jim, I don't know what you're talking about." And his answer was .. . "Don't worry about it."
In answers to interrogatories, plaintiff indicated Brown also told him that "we don't need people like you around here."
On the morning of June 25, Brown asked plaintiff for an accident report concerning an auto accident plaintiff was involved in during the prior December. Plaintiff responded, "Jim, the accident report was submitted in December of '81." Brown persisted in a tone characterized by plaintiff as "[i]nsolent, aggressive, arbitrary [and] loud." Brown looked through plaintiff's desk drawers, and later another employee asked plaintiff for his car keys so Brown could look through the trunk. Thereafter, Brown told plaintiff that they had lost his keys. Several Leasametric employees went through plaintiff's car looking for his keys. Plaintiff asserted:
I went back outside and they were still searching in the trunk and turning and toppling things over and destroying and mixing up the boxes and all my records and the catalogs and everything else was turned over topsy-turvy and moved around with a wire hanger and everything was disheveled and practically was thrown every which way on the premise that the keys were in there, and then about 20 minutes later Jim Brown walks out with the keys in his hand.
These events occurred in front of several Leasametric employees.
On June 28, plaintiff was paged at about 9:15 a.m. while servicing one of his accounts in Fort Monmouth. He called the Allendale office, and Brown told him to "[g]et up here right away." "Angry" and "furious," Brown approached plaintiff when he arrived, and demanded to see plaintiff's accident report kit. When plaintiff responded that he did not have a report kit, Brown "became real abusive towards me and said, *26 `open up your drawer,' and rummaged through the desk, and this was in front of everybody. It was quite embarrassing."
When Brown could not find the kit in plaintiff's desk, his next statement was:
"Get your keys. Get your car opened. I want to look through your truck," and that was loud. He yelled that out again. And at that time I said, "What is going on here? What are you trying to do? You're provoking me." He said, "I don't care. You just get those keys, open that trunk. I want to look in your trunk."
When Brown could not find the kit, he went to the phone and called the personnel manager who instructed Brown to issue plaintiff a warning letter for not properly filling out an accident report. Brown returned and again yelled at plaintiff. Plaintiff thereafter stated: "I'm going to leave now and it looks like you're provoking me." Brown asked plaintiff if he was quitting. Plaintiff responded that he was not quitting, but that he was going to see a lawyer.
On the evening of June 28, the personnel manager notified a vice-president of the altercation and asked him to investigate it. The vice-president telephoned plaintiff, and plaintiff agreed to meet him the next day at the Allendale office. Plaintiff never attended the meeting due to difficulty with his neck and back, and did not reschedule it. After investigating the incident, the vice-president recommended that plaintiff be fired. On June 30, plaintiff received a mailgram from the vice-president indicating that he was fired for insubordination. Plaintiff spoke with the company president several times afterwards, but to no avail. Upon being terminated, plaintiff had to return his company car.
Plaintiff contends that the trial court erred in granting summary judgment on the slander counts, because "Brown's loud, abusive and arrogant tone of voice, coupled with his insistence upon searching through plaintiff's desk, personal belongings and company car" fairly indicated "that Brown unjustifiably accused plaintiff of lying and ridiculed and embarrassed plaintiff" in front of his co-workers. Defendants deny that the words were defamatory in nature and also claim that they were protected by a qualified privilege.
*27 In granting defendants' summary judgment motion, the motion judge reasoned
that the alleged defamatory statements, when viewed in context, do not rise to the level of an assertion or implication of a statement of fact injurious to plaintiff's reputation. The Court further finds that the alleged defamatory statements were, in any case, subject to a qualified privilege since they were made by defendant Brown in the course of and concerning Leasametric's business operations. Plaintiff has not come forward with sufficient facts indicative of excessive publication to defeat the operation of this privilege.
In Dairy Stores, Inc. v. Sentinel Pub. Co., Inc., 191 N.J. Super. 202, 207 (Law Div. 1983), aff'd o.b. 198 N.J. Super. 19 (App.Div. 1985), aff'd 104 N.J. 125 (1986), we noted:
The threshold issue in every defamation action is whether the language in question is reasonably susceptible of a defamatory meaning. Lawrence v. Bauer Pub. & Print., Ltd., 89 N.J. 451, 455 (1982); Kotlikoff v. The Community News, 89 N.J. 62, 67 (1982). A defamatory meaning will be found only if the language asserts or implies a statement of fact which is damaging to reputation. Kotlikoff v. The Community News, supra, 89 N.J. at 68-70. And liability may be imposed only if the statement of fact is shown to be false. Ibid. [191 N.J. Super. at 207].
As stated in Prosser and Keeton, The Law of Torts, at 776 (5 ed. 1984):
mere words of abuse, indicating that the defendant dislikes the plaintiff and has a low opinion of him, but without suggesting any specific charge against him, are not to be treated as defamatory. A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more.
In Gertz v. Welch, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974), the Court stated that there is no such thing as a false idea, and "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Relying in part on Gertz, the court in Bucher v. Roberts, 198 Col. 1, 595 P.2d 239 (1979), considered whether an employer's statements to his employee were slanderous. The employee, a buyer of young men's clothes for a department store, alleged that his employer's statement was "tantamount to a declaration that [he was] incompetent as a buyer." 595 P.2d at 241. In finding that the statement was not defamatory, the court held that if it is necessary to speculate concerning the meaning the statement purports to convey, "we enter the area of opinion as *28 opposed to factual assertion." Ibid. The court therefore decided that the employer's statement was a protected opinion under Gertz. Ibid.
In this case, Brown did not assert a statement of fact damaging to plaintiff's reputation. His requests for plaintiff's keys and files and his offer of a recommendation letter were not defamatory. Although plaintiff objected to Brown's searching of his car and desk for the missing report, these actions were not defamatory statements. Further, the "mere use of foul, abusive or vituperative language ... does not constitute a defamation." Bucher, 595 P.2d at 241.
We find no evidence to detract from the motion judge's conclusion that Brown's alleged defamatory statements "do not rise to the level of an assertion or implication of a statement of fact injurious to plaintiff's reputation." It is therefore not necessary for us to consider whether the statements were privileged.
Plaintiff contends the trial judge erred when granting summary judgment on his wrongful termination claims as there were genuine issues of material fact. Plaintiff alleges that Leasametric fired him "to avoid having to pay a duly earned commission" and that this was a violation of public policy thereby supporting a cause of action under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980), rev'g 166 N.J. Super. 335 (App.Div. 1979). Plaintiff further argues that Leasametric failed to follow the discharge procedures outlined in its company manual.
Defendants contend that plaintiff "has not identified any specific expression or clear mandate of public policy allegedly violated by the defendants in discharging him" as required under Pierce, and that plaintiff was fired in accordance with the "standard operating procedure" outlined in the manual.
The motion judge, in granting summary judgment as to the wrongful discharge claims, stated:
[T]he Court finds that plaintiff was an employee at-will who was subject to termination with or without cause by the defendant Leasametric. Plaintiff has *29 not come forward with facts indicating that plaintiff's discharge violated the termination procedures provided for in Leasametric's personnel policy manual. Plaintiff has further failed to demonstrate that plaintiff's discharge was contrary to a clear mandate of New Jersey public policy.
In Pierce, an associate to the director of medical research opposed the development of a drug asserting that it contained unacceptable levels of saccharin. 84 N.J. at 62-63. Her supervisor took her off the project, but offered to assign her to another project. Ibid. Feeling she was being demoted, she resigned and sued Ortho for wrongful discharge. Id. at 63-64. The trial judge granted Ortho's motion for summary judgment on the ground that Ortho "had the right to terminate her employment for any reason whatsoever." 166 N.J. Super. at 339. The Supreme Court ruled that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 N.J. at 72. However, the Court affirmed the dismissal because it found no public policy against conducting research on drugs that were controversial, so long as they were subject to FDA approval. 84 N.J. at 76.
The Supreme Court in Lally v. Copygraphics, 85 N.J. 668, 670 (1981) held that a plaintiff had a common law right of action for wrongful discharge based upon an alleged retaliatory firing attributable to the filing of a workers' compensation claim. The specific public policy required in Pierce was found to exist in that N.J.S.A. 34:15-39.1 and 39.2 made it unlawful to discharge an employee for filing a workers' compensation claim. Id. at 670-71. See also Kalman v. Grand Union Co., 183 N.J. Super. 153, 159 (App.Div. 1982); Crowell v. Transamerica Delaval, Inc., 206 N.J. Super. 298 (Law Div. 1984).
In several cases we have found that a clear mandate of public policy was not breached by an employee's termination. In Warthen v. Toms River Community Mem. Hosp., 199 N.J. Super. 18, 26-27 (App.Div.), certif. den. 101 N.J. 255 (1985), the court held that public policy did not preclude a hospital from discharging a nurse who refused to administer kidney dialysis *30 to a terminally ill patient based on the nurse's moral, medical and philosophical objections to the procedure. Although the Code for Nurses stated that the nurse was justified in refusing to participate, id. at 26, we held that the relied-upon passage in the Code "define[d] a standard of conduct beneficial only to the individual nurse and not to the public at large." Id. at 27. We held in Alexander v. Kay Finlay Jewelers, Inc., 208 N.J. Super. 503, 507-08 (App.Div.), certif. den. 104 N.J. 466 (1986) that the discharge of an employee due to his commencement of a civil action to resolve a salary dispute did not violate any clear mandate of public policy. In sum, a cause of action under Pierce has been recognized if the firing was in retaliation for an employee's refusal to commit an act which would violate a statute or for assertion of a right protected by legislation, or for firings which were "invidiously discriminatory." Citizens State Bk. of N.J. v. Libertelli, 215 N.J. Super. 190, 195 (App.Div. 1987).
Even if Leasametric fired plaintiff to avoid paying him commissions, no tort action against Leasametric would lie. Cappiello v. Ragen Precision Indus., Inc., 192 N.J. Super. 523, 529 (App.Div. 1984). Further, we hold that the firing was not contrary to "a clear mandate of public policy." Pierce, 84 N.J. at 72. See Wakefield v. Northern Telecom, Inc., 769 F.2d 109, 111-12 (2d Cir.1985), where the court held that, under both New Jersey and New York law, an employee had no cause of action for wrongful termination when his employer fired him to avoid paying commissions. While the defendant Brown might be liable if he maliciously caused plaintiff's firing with a purpose to deny him commissions due from the employer, Cappiello, 192 N.J. Super. at 529, we are unable to discern such an allegation from the pleadings. Evidence of Leasametric attempting to avoid paying plaintiff commissions would be relevant on the issue of motive for the alleged breach of contract and whether the allegation of insubordination was contrived.
Plaintiff also contends, however, that Leasametric violated its employment contract with him in that Leasametric failed to *31 follow the procedures outlined in the company manual. In Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 297, mod. 101 N.J. 10 (1985), the Supreme Court held that the termination clauses of the company's personnel policy manual, including the procedure required before termination occurs, could be found to be contractually enforceable. The Court concluded that "when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary ... should construe them in accordance with the reasonable expectations of the employees." Id. at 297-98. "A policy manual that provides for job security grants an important, fundamental protection for workers." Id. at 297. Woolley is not an exception to the at-will doctrine, "but, rather, a recognition of basic contract principles concerning acceptance of unilateral contracts." McQuitty v. General Dynamics Corp., 204 N.J. Super. 514, 520 (App.Div. 1985).
The manual in question provides a three-step disciplinary procedure "to correct poor job performance or minor acts of misconduct." It also indicates that employees are subject to immediate termination for designated acts of misconduct, including insubordination, and that "[i]n severe situations which require immediate termination, ... contact the Personnel Manager to determine appropriate action." The manual further provides:
A. The only authority to terminate employees rests with the President and Personnel Manager. Prior to termination of an employee's employment, the President or Personnel Manager must be consulted and be in agreement with termination.
The facts warrant the assumption on a summary judgment motion that this manual was widely distributed throughout the company and created a reasonable expectation in the employees that firings would be carried out in accordance with the established procedures. Therefore, Leasametric was required under Woolley to follow the termination procedures *32 contained in the manual. Thus, a factual question exists as to whether Leasametric adequately followed the manual's prescription. Although according to the manual plaintiff could be subject to immediate termination for insubordination, a fact question remains as to whether plaintiff's conduct constituted insubordination and/or whether so severe a situation was created as to require the action taken. Plaintiff alleges that the reasons offered for dismissal were merely a subterfuge and that plaintiff's reaction was a natural consequence of deliberate provocation by defendants who sought to terminate him for profit motives. Plaintiff's loss of commissions and bonus would, of course, be a proper item of damages if plaintiff prevails on his Woolley claim.
A court may only enter summary judgment when it finds that, after drawing all inferences of doubt against the movant, there is no genuine issue of material fact. Pierce, 84 N.J. at 65; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954). We therefore conclude that summary judgment was improvidently granted as to plaintiff's wrongful discharge claims.
Affirmed as to the dismissal of Counts One, Four and Five of plaintiff's amended complaint. Reversed and remanded as to Counts Two and Three, which are hereby reinstated.