247 N.J. Super. 297 (1991)
589 A.2d 170
JAMES HENNESSEY, PLAINTIFF-RESPONDENT,
v.
COASTAL EAGLE POINT OIL COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1990.
Decided April 1, 1991.
*298 Before Judges BRODY, GRUCCIO and D'ANNUNZIO.
*299 Lawrence S. Coburn argued the cause for appellant (Pepper, Hamilton & Scheetz, attorneys) Peter P. Green, on the brief (Green, Lundgren & Ryan, attorneys).
James Katz argued the cause for respondent (Tomar, Simonoff, Adourian & O'Brien, attorneys).
Eric Neisser argued the cause for amicus curiae, American Civil Liberties Union.
Paul I. Weiner argued the cause for amicus curiae, Employment Law Council (Weiner & Lesniak, attorneys).
Peter T. Manzo submitted a brief for amicus curiae, Washington Legal Foundation and Parents' Association to Neutralize Drug & Alcohol Abuse.
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
This opinion addresses random urine testing by a private sector employer to detect the illicit use of drugs.
Plaintiff, James Hennessey, was an at-will employee of defendant, Coastal Eagle Point Oil Company (Coastal). As part of its drug interdiction program, Coastal subjected Hennessey to a random urine test on June 9, 1986. The test revealed Hennessey's use of marijuana and diazepam. Marijuana is a Schedule I controlled dangerous substance and diazepam is a Schedule IV substance. N.J.S.A. 24:21-5e.(10); N.J.A.C. 8:65-10.4(b)2. The possession or use of those substances are criminal offenses under New Jersey statutes. N.J.S.A. 24:21-20a and b, (current version at N.J.S.A. 2C:35-10a and b (1987)). Although diazepam is the active ingredient in a frequently prescribed tranquilizer (Valium), Hennessey does not contend that he used diazepam pursuant to a valid prescription.
Coastal discharged Hennessey, who then commenced this action for wrongful discharge. Plaintiff's six count amended complaint alleged a variety of legal theories to support his allegation that Coastal wrongfully discharged him. The parties *300 stipulated damages in the amount of $100,000 and cross-moved for summary judgment on liability. The trial court entered judgment in plaintiff's favor under count one which alleged a discharge "contrary to a clear mandate of public policy of the State of New Jersey." See Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). Coastal appeals from the judgment, and we now reverse.
Before we discuss the legal issues, some background information will be helpful to understand the context in which this dispute arose.
Coastal operates an oil refinery which it acquired from Texaco in May, 1985. Coastal's facility is located on 1,000 acres and it includes an 800 acre tank farm with 120 storage tanks. The largest tank has a capacity of 21,000,000 gallons. The facility operates 24 hours per day with 330 employees, producing 4,800,000 gallons of refined product each day. The refinery produces gasoline, jet fuel, high octane aviation fuel, kerosene, heating oils, benzene, cumene, butane and propane gas. All of the products are combustible and some are highly toxic.
The refining process requires the application of high temperatures, sometimes reaching 1,300 degrees fahrenheit, and pressures up to 500 pounds per square inch. Catalysts such as sulfuric acid are used, and hydrogen gas is a major by-product.
Crude oil is delivered to Coastal by tanker or pipeline. It is transported to a processing unit or to a tank for storage. After completion of the refining process, the end product is transported to a storage tank and eventually piped to a dock or a railroad or truck loading facility, where the product is loaded for shipment out of the refinery.
Hennessey had been a Texaco employee who retained his job when Coastal acquired the refinery in May, 1985. He was employed in the Movement and Storage Division as a lead pumper in the tank farm. Two paragraphs from the affidavit of James Myers, a Coastal executive, explain the function of a lead pumper:

*301 Beneath the position of lead pumper in the organizational chart of the Tank Farm are the positions of gaugers. The gaugers are responsible for blending gasoline in the tanks, placing the proper amounts of butane, lead, anti-knock and dye in the tanks; unloading lead tank cars into a special tank; and being in charge of the propane tanks and the sales tanks in the sales department. A gauger also gauges the tank to measure the volume of product in the bank and the rate of inflow or outflow of product and opens and closes the valves that control the flow of product through the Tank Farm. The gaugers are directed in their work duties by the lead pumper.
The lead pumper at the Coastal refinery works in the control room in the Tank Farm where in front of him are two telephones, one radio and a console board registering the condition of the valves (e.g., what valves are open) and the nature of many of the line-ups throughout the Tank Farm. From the control room, the lead pumper directs the work activities of the gaugers, who do very little without the lead pumper's direction. At the beginning of his shift, the lead pumper receives orders and instructions on what products are to be pumped and what volumes are to be pumped during the course of his shift. The lead pumper must heavily rely on the accuracy of those instructions, just as the lead pumper must heavily rely on his orders and instructions, which are largely based on the preceding lead pumper's work and records. If the volume levels given to a lead pumper are not expressed in gauge levels, the lead pumper must first make accurate calculations to convert the volume and figures into gauge levels that can then be conveyed to and used by the gauger at the Tank Farm. The lead pumper must then interpret and understand all of his orders in order to be able to convey them properly to the gaugers.
When Coastal acquired the refinery in May 1985, it retained the Texaco work-force, but subjected the employees to physical examinations, including urinalysis. Hennessey's urine test at this time was negative for evidence of drug use. However, the 1985 urine testing revealed that 19% of the work force used drugs. According to the affidavit of Michael J. Hoey, Coastal's Manager of Employee Relations, the drug users were "given a stern warning by Coastal that any form of drug use or impairment at work would not be tolerated."
As a result of the 1985 drug test results, Coastal adopted and disseminated to all employees a written policy titled "Company Policy On Alcohol, Drugs And Controlled Substances." A memorandum dated June 21, 1985, accompanied the written policy. A copy of the policy is attached to this opinion as appendix A. It includes a directive that any employee using a drug or medication "known or advertised as possibly affecting *302 or impairing judgment, coordination, or other senses or which may adversely affect the ability to perform work in a safe and productive manner must notify his or her supervisor or other management official prior to starting work...."
The policy also warned employees that any employee "may at any time be required to give a urine or blood sample in order to determine compliance with the policy."
The accompanying memorandum informed the employees "that any violations of this policy may lead to immediate termination," but that employees who voluntarily admitted to a drug problem would be assisted in their efforts at rehabilitation. A copy of the memorandum is attached to this opinion as appendix B.
According to Hoey, Coastal discovered evidence of on-the-job marijuana usage in January, 1986. As a result, Coastal implemented a program of random urine testing in the spring of 1986. Each week, Coastal tested five employees selected randomly by the plant nurse. To deter the submission "of fake or adulterated samples ... an observer is present in the lavatory and observes from the rear while a sample is submitted, with the observer instructed ... not to look at any of the employees' genitalia or private parts." The sample is tested solely for evidence of drugs, initially through an Enzyme Multiplied Immunoassay Technique (EMIT) test. A positive EMIT is confirmed by a gas chromatography mass spectrometry test. See In re Carberry, 114 N.J. 574, 579-580, 556 A.2d 314 (1989), for a discussion of those tests. In the present case, the parties stipulated that the test of Hennessey's urine yielded an accurate result.
The trial court relied on the prohibition against unreasonable searches and seizures, found in Article I, paragraph 7 of the New Jersey Constitution, as the source of the public policy which it found that Coastal had violated. The court also relied on Fraternal Order of Police v. City of Newark, 216 N.J. Super. 461, 524 A.2d 430 (App.Div. 1987), in which another panel of *303 this court invalidated a Newark Police Department directive mandating urine testing for all members of the department's narcotics bureau upon transfer into the bureau and at least twice a year while assigned to the bureau. In Fraternal Order of Police, the panel held that in the absence of individualized suspicion, urine testing is an unreasonable search and seizure in violation of the New Jersey constitution. Id. at 477, 524 A.2d 430. See also Allen v. Passaic Cty., 219 N.J. Super. 352, 530 A.2d 371 (Law Div. 1986). But cf. Local 194A v. Burlington County Bridge Comm'n., 240 N.J. Super. 9, 572 A.2d 204 (App.Div.) (urine testing of public employees in the absence of individualized suspicion does not violate constitution where employer can demonstrate special need such as public safety), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990). The trial court also determined that Coastal's testing was performed in an "unreasonable and obtrusive manner," which also violated public policy.
In Pierce, the New Jersey Supreme Court recognized that an employee at will has a cause of action for wrongful discharge if "the discharge is contrary to a clear mandate of public policy." Pierce, supra, 84 N.J. at 72, 417 A.2d 505. Although Pierce recognized the cause of action, it affirmed a summary judgment for the employer. Id. at 76, 417 A.2d 505. On the record before it, the Court found that plaintiff, a medical doctor engaged in pharmaceutical research, merely had become involved in "a difference in medical opinion" with her corporate supervisors regarding drug research which was subject to FDA approval and control, and, therefore, it found no violation of public policy in her termination. Id. at 75-76, 417 A.2d 505.
The Pierce cause of action is not unique to New Jersey. Other jurisdictions had recognized a cause of action for discharges violative of public policy, and they were discussed in the Pierce opinion. Id. at 67-70, 417 A.2d 505. In Pierce, the Court stated "[t]he sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions," and that "[i]n certain instances, a professional code of *304 ethics may contain an expression of public policy." Id. at 72, 417 A.2d 505.
Recently, New Jersey courts have addressed the application of Pierce. In Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 536 A.2d 237 (1988), the plaintiff alleged that she had been discharged in retaliation for her attempts to determine whether gender discrimination had barred her advancement. Id. at 192, 536 A.2d 237. The Court held that this allegation, if true, would constitute a violation of the public policy established by the Legislature when it adopted New Jersey's Law Against Discrimination. Id. at 192-193, 536 A.2d 237; see N.J.S.A. 10:5-1 et seq.
In Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 538 A.2d 1292 (App.Div. 1988), we held that a retaliatory discharge for having filed a worker's compensation claim supported a civil action for damages, in addition to the statutory remedies of reinstatement, back pay and civil penalty. Id. at 442-443, 538 A.2d 1292; see N.J.S.A. 34:15-39.1 and 39.2. We also held that discharge for having filed a complaint with the Occupational Safety and Health Administration was actionable under Pierce. Id. at 445-446, 538 A.2d 1292. Accord Lepore v. National Tool and Mfg. Co., 224 N.J. Super. 463, 470, 540 A.2d 1296 (App.Div. 1988), aff'd, 115 N.J. 226, 557 A.2d 1371, cert. denied, ___ U.S. ___, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989).
Other recent decisions have held Pierce to be unavailable. In House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 556 A.2d 353 (App.Div.), certif. denied, 117 N.J. 154, 564 A.2d 874 (1989), we affirmed a summary judgment in favor of the employer. Plaintiff alleged that defendant terminated him because he had complained to his supervisor about the shipment of a product he deemed to be contaminated. After a thorough review of decisions from New Jersey and other jurisdictions, we held that the mere voicing of opposition to corporate policy within a corporation provides an insufficient foundation for assertion of a Pierce claim. Id. at 49, 564 A.2d 874.
*305 In Schwartz v. Leasametric, Inc., 224 N.J. Super. 21, 539 A.2d 744 (App.Div. 1988), plaintiff alleged that defendant discharged him to avoid paying commissions. We held that Pierce was not applicable because "a cause of action under Pierce has been recognized if the firing was in retaliation for an employee's refusal to commit an act which would violate a statute or for assertion of a right protected by legislation, or for firings which were `invidiously discriminatory.'" Id. at 30, 539 A.2d 744 (citing Citizens State Bank of N.J. v. Libertelli, 215 N.J. Super. 190, 195, 521 A.2d 867 (App.Div. 1987)).
In Alexander v. Kay Finlay Jewelers, 208 N.J. Super. 503, 506 A.2d 379 (App.Div.), certif. denied, 104 N.J. 466, 517 A.2d 449 (1986), plaintiff alleged that he had been fired because he sued his employer to resolve a salary dispute. We held that in the absence of a statute or regulation prohibiting discharge in retaliation for a civil suit, there was no Pierce cause of action. Id. 208 N.J. Super. at 507-508, 506 A.2d 379.
In the present case, the trial court went beyond Pierce when it utilized the constitutional prohibition against unreasonable searches and seizures as a source of public policy.
Private action does not violate constitutional prohibitions against unreasonable searches. Those provisions limit the exercise of government power. See Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 613-614, 109 S.Ct. 1402, 1410-1411, 103 L.Ed.2d 639, 657 (1989); United States v. Jacobsen, 466 U.S. 109, 114, 104 S.Ct. 1652, 1656-1657, 80 L.Ed.2d 85, 94 (1984); W.W. v. I.M., 231 N.J. Super. 495, 509, 555 A.2d 1149 (App.Div. 1989); State v. Sanders, 185 N.J. Super. 258, 265-266, 448 A.2d 481 (App.Div. 1982); State v. Pohle, 166 N.J. Super. 504, 508-509, 400 A.2d 109 (App.Div.), certif. denied, 81 N.J. 328, 407 A.2d 1202 (1979). Consequently, attempts to rely on constitutional protection in a private sector Pierce context involving drug testing of employees have been rejected. Johnson v. Carpenter Technology Corp., 723 F. Supp. 180, 185 (D.Conn. 1989); Greco v. Halliburton Co., 674 F. Supp. 1447, *306 1451 (D.Wyo. 1987); Monroe v. Consol. Freightways, Inc., 654 F. Supp. 661, 663 (E.D.Mo. 1987); Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1130 (Alaska 1989).
For the same reason, decisions invalidating urine drug testing by public employers in the absence of individualized suspicion are inapposite. Thus, the trial court's reliance on Fraternal Order of Police v. City of Newark, supra, was inappropriate. National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), involving customs officials, and Skinner v. Railway Labor Exec. Ass'n, supra, involving railroad workers who had been involved in accidents, dilute the vitality of Fraternal Order of Police, despite its reliance on the New Jersey constitution. In those decisions, the Supreme Court found no Fourth Amendment violation in urine testing by employers without probable cause or reasonable individualized suspicion.[1]See also Policemen's Benev. Ass'n of N.J. v. Washington Tp., 850 F.2d 133, 141 (3d Cir.1988) (municipality's drug testing program did not violate the Fourth Amendment), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); Local 194A v. Burlington County Bridge Commission, supra. In In re Carberry, supra, 114 N.J. at 587-588, 556 A.2d 314 (1989), the Court declined to decide whether it was constitutional for the Division of State Police to test a trooper's urine for drugs when the urine had been obtained as part of a preventive medicine physical. The Court acknowledged, however, that "[t]he use of illegal drugs is incompatible with the integrity of the State Police and with the ability of troopers to perform their duties." Carberry, supra, 114 N.J. at 578, 556 A.2d 314.
Plaintiff suggests that even if the constitutional prohibition against unreasonable searches does not apply directly to private *307 action, it reflects the premium society places on privacy and, therefore, the values protected by those prohibitions are a primary source for the definition of public policy. No reported New Jersey decision has applied constitutional values, through a Pierce analysis, to the private sector. Slohoda v. United Parcel Serv. Inc., 193 N.J. Super. 586, 475 A.2d 618 (App.Div. 1984), certif. denied, 104 N.J. 400, 517 A.2d 403 (1986) cited by plaintiff and heavily relied upon by amicus, American Civil Liberties Union, is not such a case.
Slohoda involved an appeal by plaintiff from a summary judgment in favor of his employer. Plaintiff contended that UPS had discharged him because he was married and had engaged in an illicit adulterous relationship. In reversing, we held that "if an employer's discharge policy is based in significant part on an employee's marital status, a discharge resulting from such policy violates N.J.S.A. 10:5-12a." which prohibits a discharge based on marital status. Id. 193 N.J. Super. at 590, 475 A.2d 618. Although plaintiff had pleaded a Pierce cause of action, we did not determine the Pierce issue because the trial judge had not ruled on it. We stated:
a remand is required because at the present time there is no judicial determination on counts five and six for us to review. On the remand, the trial judge should decide whether the employer's policy ... is violative of any right of privacy of the plaintiff and contrary to public policy.
Id. at 594, 475 A.2d 618.
Similarly, many of the decisions relied upon by plaintiff and the American Civil Liberties Union, far too numerous to cite specifically, are inapposite because they involved state action, state statutes such as N.J.S.A. 2A:156A-1 et seq. (wiretapping); N.J.S.A. 2A:161A-1 et seq. (regulation of strip and body cavity searches); N.J.S.A. 2C:40A-1 (prohibiting employment related lie detector tests), and clearly inapplicable contexts, such as the right to terminate life support as in In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976).
We are reluctant to utilize constitutional values of privacy as a source of public policy under Pierce in a private employment *308 context. Application of constitutional values such as individual privacy to private relationships carries the danger that those values will "expand like a gas to fill up the available space." Luedtke, supra, 768 P.2d at 1128 (quoting Gerety, Redefining Privacy, 12 Harv.C.R.-C.L.L.Rev. 233, 234 (1977)). Plaintiff, however, refers us to Novosel v. Nationwide Ins. Co., 721 F.2d 894 (3d Cir.1983). Novosel was a diversity action alleging wrongful discharge contrary to public policy under Pennsylvania law. The Court of Appeals found an applicable public policy in the rights of free speech and political activity guaranteed by the First Amendment and by Article I, Section 7 of the Pennsylvania Constitution. Consequently, the Court of Appeals held that plaintiff stated a cause of action when he alleged that he was discharged for failing to support his employer's lobbying efforts in behalf of a pending "No-Fault Reform Act." Id. at 900-901. We reject Novosel's application to the present case. In Novosel, the Court of Appeals was attempting to apply Pennsylvania law, not New Jersey law. Moreover, in Novosel, the Court relied upon preferred First Amendment rights of free speech and political association as a basis of public policy. See Saia v. People of the State of N.Y., 334 U.S. 558, 562, 68 S.Ct. 1148, 1151, 92 L.Ed. 1574, 1578 (1948); Marsh v. Alabama, 326 U.S. 501, 509, 66 S.Ct. 276, 280, 90 L.Ed. 265, 270 (1945). Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430, 440 (1945). Reeves v. McConn, 631 F.2d 377, 382 (5th Cir.1980).
We conclude that the State and Federal constitutional safeguards against unreasonable searches and seizures do not constitute a clear mandate of public policy under Pierce in a private employment context and that privacy, though an important value of our society, is too amorphous a standard to qualify under Pierce as a clear mandate of public policy. But cf. Luedtke, supra, 768 P.2d at 1130 (although constitutional right to privacy not applicable "there is a public policy supporting the protection of employee privacy ... [which] may rise to *309 the level of a breach of the implied covenant of good faith and fair dealing.").
Moreover, giving the plaintiff the benefit of a concession, merely for the purpose of this opinion, that the right of privacy may provide a public policy which an employer transgresses at his peril, we perceive no basis for a Pierce cause of action in this case.
There is no right in New Jersey to the private use of controlled dangerous substances by adults in their homes. But cf. Ravin v. State, 537 P.2d 494, 511 (Alaska 1975). As previously indicated, the possession or use of marijuana and non-prescribed diazepam is an offense. Thus, Coastal's drug use enforcement policy, including random urine testing and job termination, does not interdict any right to the private use of those substances.
Although urine testing provides an employer with private information, we deem the court's characterization of it in Fraternal Order of Police v. City of Newark, supra, as "a significant interference with personal privacy and autonomy" and as a "profoundly demeaning" intrusion to be overstated. 216 N.J. Super. at 474, 524 A.2d 430. Providing a urine sample is a very simple process, one that is performed thousands of times each day in medical laboratories and doctor's offices. The fact that another person of the same sex is present to prevent submission of a false sample is not profoundly demeaning. Men urinate in the presence of other men countless times each day in public restrooms. See National Treasury Employees Union v. Von Raab, 808 F.2d 1057, 1061 (5th Cir.) (Higgenbotham, Circuit Judge, concurring) (denying stay pending appeal), Opinion on Appeal, 816 F.2d 170 (1987), aff'd in part, vacated in part, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The privacy interests in the physiological information which can be gleaned from urine testing is afforded substantial protection where, as in this case, the testing procedures are limited and specific. "It appears, then, that it is the reason the *310 urinalysis is conducted, and not the conduct of the test, that deserves analysis." Luedtke, supra, 768 P.2d at 1135.[2]
Coastal's testing program was designed to identify employees who illicitly used drugs and, through the threat of identification, to deter drug use. Coastal's self-interest in the deterrence of drug use by its employees includes the protection of its property from damage, the prevention of fire, explosion and pollution, the prevention of injury to its employees and the reduction of liability exposure to third persons. Though Coastal's objectives were determined by its self-interest, those objectives are consistent with this State's vigorous anti-drug policy as expressed in the Comprehensive Drug Reform Act of 1986. L. 1987, c. 106; N.J.S.A. 2C:35-1 to 23. The State's policy is also evident in the lie detector statute, N.J.S.A. 2C:40A-1, which makes it a disorderly persons offense for an employer to request or require an employee or prospective employee to submit to a lie detector test. Plaintiff relies on this statute as a legislative expression of employees' privacy rights. However, the statute contains an exception. It strips away those privacy rights where "the employee or prospective employee is or will be directly involved in the manufacture, distribution, or dispensing of, or has or will have access to, legally distributed controlled dangerous substances." Thus, in an important expression of policy regarding employee privacy, the Legislature authorized an invasion of that privacy in the interest of deterrence of illicit drug use and distribution.
Moreover, Coastal's objectives and self-interest are consistent with the public policy against pollution, see e.g., N.J.S.A. 58:10A-1 et seq. (Water Pollution Control Act), and the public policy in favor of a safe work place, see e.g., Occupational *311 Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. (1970); Worker Health and Safety Act, N.J.S.A. 34:6A-1 to 24.
Implicit in Coastal's drug interdiction program is the recognition that drug usage can impair job performance. See Ravin v. State, supra, 537 P.2d at 504-506, (discussing the immediate and short-term effects of marijuana use including euphoria, a feeling of well-being, some temporary impairment of "immediate-past-memory facility," and impairment of psycho-motor control). Plaintiff and amicus concede that drug use can impair job performance. They suggest, however, that Coastal must wait until it has reasonable individualized suspicion that an employee is impaired or is using drugs before it can subject him to a urine test. We reject this contention on three grounds. Because the constitutional guarantees against unreasonable searches are not applicable to private action, there is no applicable requirement of probable cause or similar limiting standard. Secondly, there is no assurance that evidence of impairment will be available before it is manifested in the deficient performance of a particular task. Finally, Coastal has a legitimate interest in protecting itself through the elimination of drug using employees before they appear at the workplace in an impaired condition, which may or may not be readily discernible. Cf. Luedtke, supra, 768 P.2d at 1136 (employer justified in determining whether its employees "are possibly impaired on the job by drug usage off the job").
We emphasize that we are deciding a very narrow issue: whether Hennessey has a cause of action under Pierce. Our brief comparison of Hennessey's privacy interests and Coastal's interests demonstrates the wisdom of requiring a violation of a clear mandate of public policy as the predicate of a Pierce cause of action. Otherwise, the courts would become involved in weighing and balancing ever present sets of competing public and private interests, thereby intruding unduly into the employment relationship.
*312 Reversed and remanded for further proceedings.[3]

APPENDIX A

COMPANY POLICY ON ALCOHOL, DRUGS AND CONTROLLED SUBSTANCES
It is the company's policy to maintain a safe, productive working environment for everyone, and to safeguard company property. As part of this policy, the company prohibits the use, sale, transfer or possession of alcohol, drugs or controlled substances on any company premises or work sites. In addition, the company prohibits any employee from being at work under the influence of alcohol, drugs or controlled substances. The company also prohibits any visitor, contractor, or employee of any contractor from being on company premises or work sites while under the influence of alcohol, drugs or controlled substances. For purposes of this policy the following definitions are applicable:
(1) Alcohol. Alcohol includes all intoxicating beverages that contain alcohol, including beer and wine.
(2) Drugs and Controlled Substances. Drugs and controlled substances include all substances not prescribed by a licensed physician for use by the person possessing them. The company will determine at its sole discretion what is a drug or controlled substance. Any questions about whether or not a substance is *313 a drug or controlled substance should be directed to your supervisor.
Anyone taking a drug or other medication, whether or not prescribed by the employee's physician for medical conditions, which is known or advertised as possibly affecting or impairing judgment, coordination, or other senses or which may adversely affect the ability to perform work in a safe and productive manner, must notify his or her supervisor or other management official prior to starting work in any of the company's facilities. The supervisor or management official will decide if the employee can remain at work on the company's premises or work site and what work restrictions, if any, are deemed necessary.
In order to insure that each individual is provided a safe workplace, the company reserves the right to conduct searches or inspections of employees and their personal effects and vehicles located on the company's premises. These searches may be made without prior warning and may be conducted with the assistance of electronic devices, search dogs and representatives of law enforcement agencies. The company may require that an individual may at any time be required to give a urine or blood sample in order to determine compliance with this policy. A refusal to provide a sample means that there is a presumption of a violation of this policy. Any employee who violates or refuses to comply with this policy may be disciplined, including discharged.
Visitors or contractors who come onto the company premises are also subject to all provisions of this policy.

APPENDIX B

DEPARTMENTAL CORRESPONDENCE
 Date JUNE 21, 1985 
COMPANY POLICY ON ALCOHOL, DRUGS AND CONTROLLED SUBSTANCES
*314
 ALL EAGLE POINT EMPLOYEES Dep't. _________________________
 George L. Orescan Dep't. _________________________
We are very anxious to help all of our employees succeed in their new careers with Coastal Eagle Point Oil Company, and are committed to doing everything possible to ensure the safety and well being of our employees. In this connection, and to avoid any possible problems in the future, I feel it is important to clearly communicate the attached policy regarding alcohol, drugs or controlled substances to all employees.
For the well being of our employees we consider this to be a very serious matter and want you to understand that any violations of this policy may lead to immediate termination. Additionally, please keep in mind that federal and state laws may require the company to notify law enforcement agencies of certain violations.
Consistent with our desire to help every employee, we urge anyone who recognizes that they have a habit or problem which may be in violation of this policy to inform a member of management of their situation. In these cases we will work with the employee to encourage rehabilitation.
With the quality of the work force that we have at Eagle Point, we do not anticipate any problems; however, it is clearly to the benefit of everyone that there be no misunderstandings in such a crucial area. If you have any questions, please contact your supervisor, Mike Hoey, or me.
 GLO:cr
 Attachment
NOTES
[1] Governmental action clearly was involved in the customs officials case because the federal government was the employer. Skinner, on the other hand, involved private sector employees, but the Court found government action because the Federal Railroad Administration had authorized the tests.
[2] A cynical observer may conclude that urine testing becomes less demeaning to the person tested when the intent is to detect illness or disease rather than illicit drug use.
[3] The judgment appealed from disposed of the remaining counts in the following manner:

In light of this Court's decision as to Count One being dispositive of the matter of liability, Counts Two, Three, Five and Six of Plaintiff's First Amended Complaint are dismissed without prejudice as moot.
Those counts asserted causes of action for violation of plaintiff's right to privacy and seclusion; violation by Coastal of its policy and practice regarding employees who use drugs; intentional or negligent infliction of emotional distress. Presumably, they are no longer moot. Plaintiff had withdrawn the fourth count which alleged discrimination against a handicapped person, and it was dismissed with prejudice by stipulation.