206 N.J. Super. 298 (1984)
502 A.2d 573
WILLIAM W. CROWELL, PLAINTIFF,
v.
TRANSAMERICA DELAVAL, INC., DEFENDANT.
Superior Court of New Jersey, Law Division Burlington County.
September 17, 1984.
*299 John F. Pilles, Jr. for plaintiff (Schlesinger, Schlosser, Foy & Harrington, attorneys).
Jerem M. Gordon for defendant (Parker, McCay & Criscuolo, attorneys).
HAINES, A.J.S.C.
Nemo protest mutare consilium suum in alterius injuriam.[1]Justinian's Digest, 50, 17, 75, Black's Law Dictionary 1190 (4th Ed. 1968).
The issue here is whether this ancient doctrine thoroughly entrenched in our jurisprudence and known as equitable estoppel, is "public policy" that prevents the discharge of an employee at will on the facts of this case.
William W. Crowell was an employee of the defendant for nearly 13 years, becoming foreman in 1978. He was involved, during the time of employment with which we are concerned, in the manufacture of a condenser for a nuclear submarine. Written specifications for the condenser were provided to all foremen, including the plaintiff. On April 15, 1983, he discovered that certain tubes which were component parts of the condenser were "over rolling" and therefore out of specification. He promptly halted the manufacturing operations, marked the deficient tubing with red plugs and consulted the defendant's quality control inspector who, in turn, conferred with his supervisor concerning the problem. They decided that the departures from the specifications were tolerable; they had been found acceptable on prior occasions. Notwithstanding these approvals, plaintiff disclosed the problem to his immediate supervisor and plant superintendent who said nothing but permitted the tube rolling operation to continue. On July 15, 1983, a similar tube-rolling defect was observed by plaintiff, who nevertheless, relying upon his April experience and advice, permitted the manufacturing process to continue. This time, *300 however, the defendant, charging plaintiff with improper supervision, terminated his employment.
Plaintiff sues, apparently on tort and contract grounds, for compensatory and punitive damages as well as other relief. The defendant, claiming the right to discharge the plaintiff as an employee at will with or without cause, moves for summary judgment dismissing the complaint. The recited facts reflect a view most favorable to the plaintiff for the purpose of the motion.
Plaintiff first argues that his employment status, as well as his ability to acquire future employment, is a property interest by virtue of the New Jersey Constitution (1947) Art. 1. par. 1, which guarantees the right to acquire, possess and protect property. The issue has not been passed upon in New Jersey. However, the United States Supreme Court has held that employment status is not a property interest protected by the due process clause of the Fourteenth Amendment to the United States Constitution. In Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court held that plaintiff's status as an employee at will "necessarily established" that he had no property interest in his employment. Id. at 345, n. 8, 96 S.Ct. at 2078 n. 8. A like decision was made in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in connection with a claimed property interest in the right to reemployment. An exception to these rulings may be fashioned from the Court's opinion in Connell v. Higginbotham, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 dealing with public employment. However, this exception is a narrow one. As the court said in Board of Regents (referring to Connell):
Only last year, the Court held that the principle "proscribing summary dismissal from public employment without hearing or inquiry required by due process" also applied to the teacher recently hired without tenure or a formal contract, but none the less with a clearly implied promise of continued employment. [at 408 U.S. 577, 92 S.Ct. at 2709; emphasis supplied.]
I find no reason to read the New Jersey Constitution differently. In Board of Regents, the court held:

*301 Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. [at 577, 92 S.Ct. at 2709]
Thus, a property interest in employment can be created by statute, by ordinance, or by an implied contract as discussed in Perry v. Sinderman, 408 U.S. 593, 602, 92 S.Ct. 2717, 2700, 33 L.Ed.2d 581. However, to have a property interest, a person must have more than a unilateral interpretation of continued employment. Bd. of Regents, at 577, 92 S.Ct. at 2709. Here, plaintiff has presented no law and no evidence of any promise of continued employment that supports his property interest claim. Plaintiff was, in fact, an "employee at will" and under state law could have his employment terminated at any time. At the most, plaintiff had a unilateral expectation of continued employment, no legitimate claim of entitlement to it.
The significant claim made by plaintiff is that his discharge was contrary to public policy. This claim is well-founded. The public policy supporting the doctrine of equitable estoppel was violated.
In Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980), the Supreme Court limited the common law rule permitting the termination of "at will" employment agreements with or without cause. It said:
We hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession or an administrative regulation concerned with technical matters probably would not be sufficient. Absent legislation, the judiciary must define the cause of action in case-by-case determinations. An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression os public policy, he may be discharged with or without cause.

*302 An employee who is wrongfully discharged may maintain a cause of action in contract or tort or both. An action in contract may be predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy.
An action in tort may be based on the duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy. In a tort action, a court can award punitive damages to deter improper conduct in an appropriate case. That remedy is not available under the law of contracts. Our holding should not be construed to preclude employees from alleging a breach of the express terms of an employment agreement. [citations omitted; at 72-73.]
The statement that an action may be based upon the discharge of an employee for refusal to perform an act that is "a violation of a clear mandate of public policy" requires discussion. In the present case, the plaintiff did not refuse to perform an act; instead his action permitted the manufacture of a defective piece of equipment. Consequently, the quoted language, if read literally, would not support the present suit. Pierce, however, cannot be read so narrowly. The Court's basic premise is that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Thus, the focus of the employee's cause of action is the discharge itself. The claim is sustainable when the discharge violates public policy. That is the plaintiff's claim in this cause.
In order to apply Pierce there must be an understanding of what is meant by "a specific expression of public policy." Id. at 72. The Court repeats this standard throughout the opinion, e.g., "clear mandate of public policy," Id. at 72, "clear expression of public policy," Id. at 73, "clear mandate of public policy," Id. at 76. In this context, the Court warns that even professional codes of ethics serving "only the interests of a profession" may not be sufficient; they must address directly some public policy at issue in the case. The plaintiff in Pierce was not permitted to recover because she did not identify a "specific expression of public policy." The Court ruled, for example, that the ethic expressed in the Hippocratic Oath that "I will prescribe regimen for the good of my patients according *303 to my ability and my judgment and never do harm to anyone," was not a sufficient pronouncement to justify her refusal to participate in reasonable research. The Court said: "An employee does not have a right to continued employment when he or she refuses to conduct research simply because it would contravene his or her personal morals." Id. at 75. It is apparent, therefore, that the Court's insistence upon the identification of "a specific expression of public policy" is intended to distinguish between subjective and objective considerations.
Pierce was followed by Lally v. Copygraphics, 85 N.J. 668 (1981), in which the court decided that a retaliatory firing caused by the filing of a workers' compensation claim gave rise to a right of action for wrongful discharge. Public policy was identified by N.J.S.A. 34:15-39.1 and 39.2, which specifically declared that such retaliatory firings were unlawful. In Kalman v. Grand Union Co., 183 N.J. Super. 153 (App.Div. 1982), the court, citing Pierce, said: "The task of a court is to distinguish between public policy and the employee's own values; the latter would not entitle the employee to immunity from discharge[.]" Id. at 156. Kalman was a pharmacist who had been discharged because he refused to close a pharmacy located in a grocery store while the grocery store was open and accessible to shoppers. He understood that certain statutes required the pharmacy to be open whenever the grocery store was open. Furthermore, the Code of Ethics of the American Pharmaceutical Association contained the following provision:
A PHARMACIST has the duty to observe the law, to uphold the dignity and honor of the profession and to accept its ethical principles. He should not engage in any activity that will bring discredit to the profession and should expose, without fear or favor, illegal or unethical conduct in the profession.
The statutes were designed to prevent public exposure to dangerous drugs in the absence of a pharmacist. The court found that Kalman's refusal to close was required by both Code and statutes; it furthered public policy, making the discharge for that reason wrongful.
The New Jersey Supreme Court in Pierce, by permitting "judicial decisions" to be sources of public policy, went further *304 than the courts of most other states. No decision in this State, including Pierce, has identified public policy on that basis in any wrongful discharge case. Since the within opinion has done so, it is helpful to consider the meaning of public policy as discussed in other cases.
In Allen v. Commercial Casualty Insurance Co., 131 N.J.L. 475 (E. & A. 1944), the Court, in determining whether a particular agreement was against public policy said:
Much has been written by text writers and by the courts as to the meaning of the phrase "public policy." All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what contracts contravene the public policy of the state. The rule of law, most generally stated, is that "public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public good * * *" even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.
The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals, and general welfare of the people for whom government  with us  is factually established. [at 477-478.]
In Garlinger v. Garlinger, 129 N.J. Super. 37 (Ch.Div. 1974), the court said:
An agreement is against public policy if it is injurious to the interest of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with public morals. [at 40.]
In Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960), the court found that an attempted disclaimer of an implied warranty of merchantability was inimical to the public good, saying:
Public policy is a term not easily defined. Its significance varies as the habits and needs of a people may vary. It is not static and the field of application is an ever increasing one. A contract, or a particular provision therein, valid in one era may be wholly opposed to the public policy of another. Courts keep in mind the principle that the best interests of society demand that persons should not be necessarily restricted in their freedom to contract. But they do not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way.

*305 Public policy at a given time finds expression in the Constitution, the statutory law and in judicial decisions. [at 403-404; citations omitted.]
Thus, Pierce is in accord with numerous other New Jersey cases that permit the definition of public policy through judicial decisions. Those decisions also make the point that actions adversely affecting good morals and the general welfare tend somehow to injure the public and are contrary to public policy. We come, therefore, to the question of whether the principle of equitable estoppel, as established by our judicial decisions, is public policy within the meaning of Pierce.
"Judicial decisions" have established the equitable estoppel rule in a long parade of cases. For example, in N.J. Suburban Water Co. v. Harrison, 122 N.J.L. 189 (E. & A. 1939), the Court said:
In modern usage, equitable estoppel and estoppel in pais are convertable terms, embracing also quasi-estoppel. They embody the doctrine, grounded in equity and justice, that one shall not be permitted to repudiate an act done or position assumed where that course would work injustice to another who, having the right to do so, has relied thereon. An estoppel arises "where a man is concluded and forbidden by law to speak against his own act or deed; yea, even though it is to say the truth." It is operative where a person "has done some act which the policy of the law will not permit him to gainsay or deny." While the creature of equity, and governed by equitable principals, it is a doctrine enforceable in courts of common law jurisdiction. It is of the essence of equitable estoppel that one is precluded from taking a position inconsistent with that previously assumed and intended to influence the conduct of another if such repudiation "would not be responsive to the demands of justice and good conscience," in that it would effect an unjust result as regards the latter. [Citations omitted; at 194.]
See also, West Jersey Title v. Industrial Trust Co., 27 N.J. 144, 153 (1958); State v. U.S. Steel Corp., 22 N.J. 341, 358 (1956).
Our cases, such as N.J. Suburban Water Co., refer to equitable estoppel as a doctrine based upon the "policy of the law," "justice," "good faith," "fair dealing," "good conscience," and "equity." Summer Cottagers' Assoc. of Cape May v. City of Cape May, 19 N.J. 493 (1955), states that the essential principle of estoppel is one which precludes taking a course of action that would work injustice and wrong to one relying on such conduct with good reason and good faith. Id. at 503. *306 Atlantic City Housing Auth. v. State, 188 N.J. Super. 145 (Ch.Div. 1983), refers to estoppel as an equitable doctrine founded on the fundamental duty of fair dealing imposed by the law. Goodpasture v. Goodpasture, 115 N.J. Super. 189 (Ch.Div. 1971), states that the foundation of equitable estoppel is justice and good conscience.
It is not in society's interest to permit one to work an injustice upon another by repudiating an act done when the other has relied thereon in good faith. Thus, public policy supports a contrary position, the position which is reflected in the estoppel doctrine.
Equitable estoppel is not only a rule of law, it is also a moral principle. Its absence would invite injustice, condone wrongdoing and permit the evasion of responsibility. Any conceivable definition of "public policy" as that term is used in Pierce, would have to embrace the concept.
The plaintiff here was led by his supervisor to believe that the manufacturing defect which he ignored was one that the company invited him to ignore. Promptly thereafter Transamerica fired him for accepting its invitation. That conduct is unconscionable. It violates public policy and creates a cause of action in contract, tort or both.
Plaintiff also argues that his at-will employment agreement contained an implied condition that it would be performed in good faith, a condition breached by the employer. The good faith requirement, like equitable estoppel, is said to reflect public policy. No New Jersey case has been cited, however, supporting the claim that employment contracts of any kind contain a good faith requirement by implication. The court's research has discovered no such authority.
Good faith has been recognized in other states. Monge v. Beebe Rubber Co., 114 N.H. 130, 316 A.2d 549 (1947) held:
... that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not the best interest of the economic system or the public good and constitutes a breach of the employment contract. [at 551.]
*307 Massachusetts has held that the implied duty to terminate an employment contract only in good faith restricts the right of discharge. Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977). See also, Manuel v. Int'l Harvester Co., 502 F. Supp. 45 (N.D.Ill. 1980); McKinney v. National Dairy Council, 491 F. Supp. 1108 (D.Mass. 1980); Cleary v. American Airlines, Inc., 111 Cal. App.3d 443, 168 Cal. Rptr. 722 (Ct.App. 1980); Petermann v. International Brotherhood of Teamsters, 174 Cal. App.2d 184, 344 P.2d 25 (Ct.App. 1959); Magnan v. Anaconda Indus. Inc., 37 Conn.Sup. 38, 429 A.2d 492 (1980); Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880 (1980).
The good faith rule adopted in these foreign jurisdictions may be attractive to New Jersey. However, it cannot be said to represent a "clear mandate of public policy" in this State at the present time. That is the requirement of Pierce. Consequently, plaintiffs' "good faith" theory must be rejected.

Conclusion
The defendants' summary judgment motion must be granted in part and denied in part. It is granted as to plaintiffs' claims of wrongful discharge based upon "property interest" and "good faith" concepts. It is denied as to plaintiffs' claim based upon the theory of equitable estoppel.
NOTES
[1] No one can change his purpose to the injury of another.