250 N.J. Super. 159 (1991)
593 A.2d 819
NANCY L. DEVRIES, PLAINTIFF-APPELLANT,
v.
MCNEIL CONSUMER PRODUCTS CO. DEFENDANT-RESPONDENT, AND JOHNSON & JOHNSON, INC., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1991.
Decided July 25, 1991.
*161 Before Judges MICHELS, GRUCCIO and D'ANNUNZIO.
Julian R. Birnbaum, admitted pro hac vice, argued the cause for appellant (Karen Honeycutt, attorney).
Francis X. Dee argued the cause for respondent (Carpenter, Bennett & Morrissey, attorneys).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Plaintiff, Nancy L. DeVries, commenced this action against her former employer, McNeil Consumer Products Co. (McNeil), and its parent, Johnson & Johnson, Inc. In her complaint she asserted a cause of action for wrongful discharge under the principles announced in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). DeVries alleged that McNeil had discharged her "in violation of the public policy supporting the doctrine of equitable estoppel." The complaint also alleged, in the third count, that defendants "did falsely and maliciously *162 accuse and criticize DeVries in her professional capacity and caused it to be believed that she was not competently discharging her duties and that she was engaging in unprofessional and unethical practices," and that this constituted defamation per se.
Plaintiff now appeals from summary judgments entered on all counts of the complaint in favor of defendant, McNeil.[1]
DeVries was employed by McNeil as a sales representative, sometimes referred to in the industry as a detail person. In that capacity she called on physicians to acquaint them with McNeil's products and to establish and promote good will on behalf of her employer. The ultimate objective of this exercise was to motivate physicians to prescribe or recommend McNeil products. One of those products was Extra Strength Tylenol caplets. Plaintiff worked for McNeil from 1983 until her discharge in 1986.
Plaintiff's discharge arose out of a confrontation with one of her assigned physicians, a Dr. LaPoff. The controversy arose when DeVries left samples of Extra Strength Tylenol caplets with Dr. LaPoff's office. Those samples contained expiration dates. At the time DeVries left those samples at LaPoff's office the dates either had expired or were close to expiring. DeVries contends that the short-dated samples were left at physicians' offices at McNeil's instructions. Pursuant to those instructions, she informed the doctors' staffs that they were not to be given to patients because they were short dated, but that they were being left for the personal use of the doctors and their staffs. According to DeVries, she also explained to the staffs that caplets used beyond the expiration date were safe and that they merely began to lose effectiveness due to age.
*163 To provide the full flavor of DeVries' version of her instructions from McNeil, we quote from a handwritten activities report prepared by plaintiff on September 9, 1986, approximately five months after she left the caplets at LaPoff's office:
During the last week in March the company (McNeill) sent representatives a huge case of EST caplet (8's) expiring in April 1986 with the instruction to be given to office staff with explicit instructions to tell the staff it was for them only and perfectly safe. This I did in every office I went to.
In the beginning of May I dropped off said samples with instructions for staff on safety and for staff usage only. During the first week in June a Dr. Steven LaPoff at the Immediacenter, 1358 Broad Street in Clifton, screaming hysterically over the telephone  irate that I left "out of date medication to his staff."
In her deposition testimony, DeVries stated:
The letter that I got at the end of March said in a few weeks you would receive a huge shipment of extra strength Tylenol samples that will be outdated at the end of April. I received that shipment probably the middle of April.
Unfortunately, no one has been able to find a copy of the written instructions or letter referred to by plaintiff.
Apparently Dr. LaPoff's office gave some of the outdated Tylenol to patients who, noticing the expired dates, complained to Dr. LaPoff. One of LaPoff's reactions was to call DeVries and berate her in somewhat intemperate language. Several months later, DeVries was in the office of Dr. Basista, one of Dr. LaPoff's associates in practice, when LaPoff again confronted and criticized her. It is uncontroverted that as plaintiff left his office, with LaPoff continuing to berate her, plaintiff told LaPoff to "grow up."
The office confrontation resulted in a letter from LaPoff to McNeil dated September 14, 1986:
I would like to bring to your attention the unprofessional and unethical practices of your representative Nancy DeVries.
Several months ago, Ms. DeVries knowingly distributed expired samples of Tylenol. When confronted, Ms. DeVries justified this action as appropriate. She stated that the samples were meant to be given to our staff. Unaware that these samples had past expiration dates, several had been given to patients unknowingly. We were placed in a very uncomfortable situation having to explain this action when patients called us concerning the expired product. I subsequently spoke to Ms. DeVries and asked her never to return to this office. Last week, Ms. DeVries returned to Immedicenter to detail us. She offered no apology and had no insight on the levity of her past actions. I once again asked *164 her to leave. Her retort, within earshot of patients and staff was that I "should grow up" and that I was "immature."
Needless to say, my partners and I were appalled over this action by a McNeil representative. Knowingly and willingly giving expired samples of Tylenol is a travesty, especially in light of the past problems McNeil (and parent company Johnson & Johnson) have experienced. In addition, berating a physician with verbal abuse within full view of his patients and staff is disrespectful and downright intolerable.
Immedicenter is an ambulatory care center and it sees approximately 30,000 patients a year. There is great potential to recommend a full line of McNeil products. However, my partners and I will be actively prescribing alternatives to these products unless a satisfactory remedy to this situation is reached. We recommend that Ms. DeVries be dismissed from her position as her actions discredit all the integrity that McNeil has tried to attain. We certainly would never allow her in this office or any future satellite offices. In addition, we will not see any McNeil representative should this situation just be allowed to rest.
Val Brunell, McNeil's national professional sales manager, responded by letter dated September 25, 1986. Brunell apologized to Dr. LaPoff and informed him that the district manager, Mr. Carmen Simone, would contact LaPoff "so that we have a full understanding of the problem and can take appropriate corrective action." Simone called Dr. LaPoff. We find it necessary to quote extensively from Simone's deposition regarding his conversation with Dr. LaPoff. Simone testified that LaPoff
said, does your company have a policy of giving out expired samples, and I said, no, sir, we do not.

Q. So you told LaPoff, no, that was not a company policy. Is that right?

A. Yes, sir, I did.

Q. What else did he ask you?
A. He said, well, if it is, then it must be Mrs. DeVries' fault. He proceeded to tell me what she was doing. She had come in their office, gave  I think it was vials of Extra Strength as samples for his  he either said nurses to use or I think he said nurses to use or staff, because he said he had a large staff, and somehow those samples got to the patients and the patients  I don't know how many he said, if it was one or more  said they came back in the office and called him up and threatened to sue him because they said Dr. LaPoff, how dare you give this stuff out, it expired and it's no good, and Dr. LaPoff was very very angry. I mean that  I was trying to calm him down on the phone, and I was doing a good job, because he says, it's about time I get someone that knows how to handle the situation.

*165 He said, well, if it wasn't the company's fault, it's Nancy's fault. Let me tell you other things that she's done, this happened awhile ago, and she had the audacity to come back in my office. She said we sat her down and I was telling her off and Nancy got up, walked out on me and turned around in front of my patients in the waiting room and shouted at me. He might have said what  he might have told me what she said, but I don't recall that or what did she shout. He says I was completely embarrassed that  to have that done in front of my patients, and he was  he said I want her  he says, unless you fire her, we will convert all our Tylenol usage to your competitor, and I believe he mentioned Advil, to be exact. He said I will stop using Tylenol and Extra Strength altogether and we will convert and I will recommend only your competition if you don't terminate her. I believe this woman should be terminated, and if someone does not get back to me with that  with the facts that she has been terminated, I will do that and.... [Emphasis added].
Simone informed Brunnell of his conversation with LaPoff, and Brunnell ordered Simone to fire DeVries. According to Simone, Brunnell told him to attribute her firing to poor human relations skills and poor attitude. Those reasons were placed on DeVries' termination report as the official reasons for her termination. However, according to Simone, Brunnell, upon ordering Simone to fire DeVries, instructed Simone to "tell Dr. LaPoff that we complied with his wishes." Simone also testified that Brunnell said, "I guess the moral of the story and the lesson to be learned is we shouldn't send out samples like this again."
Simone carried out his orders and terminated DeVries.
We first address the summary judgment on the defamation count. The trial court expressed its ruling in three sentences:
In regard to the defamation issue, there is no specific affirmative defamatory statement as a matter of law. The defamatory statement is an indication or inference arising from single conversation between LaPoff and Simone. I'm not satisfied that the inference from that language rises to defamation.
The threshold issue in a defamation action is whether the statements complained of are reasonably susceptible of a defamatory meaning. Decker v. Princeton Packet, 116 N.J. 418, 424, 561 A.2d 1122 (1989); Romaine v. Kallinger, 109 N.J. 282, 290, 537 A.2d 284 (1988). This threshold issue is a question of law for the court. If a "statement is susceptible of one meaning only, and that meaning is defamatory, the statement is *166 libelous as a matter of law." Romaine, supra, 109 N.J. at 290, 537 A.2d 284. "Conversely, if the statement is susceptible of only a non-defamatory meaning, it cannot be considered libelous, justifying dismissing the action." Ibid. "However, in cases where the statement is capable of being assigned more than one meaning, one of which is defamatory and another not, the question of whether its content is defamatory is one that must be resolved by the trier of fact." Id. at 290-291, 537 A.2d 284. Accord Decker, supra, 116 N.J. at 425, 561 A.2d 1122.
In addressing this threshold issue, "the court must evaluate the criticized language `according to the fair and natural meaning which it would be given by persons of ordinary intelligence.'" (quoting Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 431, 138 A.2d 61 (App.Div.), aff'd on rehearing, 49 N.J. Super. 551, 140 A.2d 529 (App.Div. 1958)). In evaluating the language for defamatory content, "the court must view the publication as a whole and consider particularly the context in which the statement appears." Romaine, supra, 109 N.J. at 290, 537 A.2d 284.
Certain categories of statements are defamatory as a matter of law. For example, statements alleging that the subject committed a crime are defamatory per se. Lawrence v. Bauer Publishing & Printing Ltd., 89 N.J. 451, 459, 446 A.2d 469 (1982); Sokoloy v. Edlin, 65 N.J. Super. 112, 121, 167 A.2d 211 (App.Div. 1961). Similarly, "one who falsely and without a privilege to do so publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, or profession is liable for slander per se." Sokoloy, supra, 65 N.J. Super. at 121-122, 167 A.2d 211. See Mick v. American Dental Ass'n, 49 N.J. Super. 262, 274, 139 A.2d 570 (App.Div. 1958) (words imputing to a dentist lack of professional information); Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 430, 138 A.2d 61 (App.Div. 1958), (editor of labor publication charged *167 with lack of proper credentials as labor leader), aff'd on rehearing, 49 N.J. Super. 551, 140 A.2d 529 (App.Div. 1958).
We are satisfied that a jury could conclude that the exchange between Simone and LaPoff, particularly Simone's denial that it was McNeil's policy to distribute expired samples, when taken in context had the capacity to impugn DeVries' professionalism in the health care industry.[2] LaPoff, in his September 14, 1986 letter accused DeVries of knowingly distributing expired samples. Simone's failure to explain the circumstances and his denial that it was McNeil's policy to do such a thing, constituted an accusation by McNeil that DeVries had acted unilaterally. That is how LaPoff interpreted his exchange with Simone. See Restatement (Second) of Torts § 563 (1976) ("The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express"). As previously indicated, LaPoff told Simone, "Well, if it wasn't the company's fault, it was Nancy's fault."
We reject, therefore, McNeil's contention that its employees made no defamatory communication to anyone regarding DeVries but merely failed to dispute LaPoff's accusations. See Restatement, supra, § 559, comment a, at 156 ("The word `communication' is used to denote the fact that one person has brought an idea to the perception of another."); see also Jimenez-Nieves v. United States, 682 F.2d 1, 6 (1st Cir.1982) (dishonoring checks negotiated by plaintiff implied defamatory statements about him).
Moreover, by acceding to LaPoff's request that McNeil terminate DeVries, McNeil confirmed the impression it had created, that DeVries had acted unilaterally without McNeil's authority or knowledge and against company policy. A jury could find that McNeil chose to suppress the true facts to mollify a customer at the expense of DeVries' reputation.
*168 McNeil contends that Simone's statement to LaPoff that it was not McNeil's policy to distribute expired Tylenol was true and, therefore, not actionable. See Lawrence v. Bauer Publishing & Printing Ltd, supra, 89 N.J. at 460, 446 A.2d 469. According to McNeil, it has no policy authorizing the distribution of expired samples. On the contrary, it has a written policy contained in a publication entitled McNeil Consumer Products Company Professional Sales Representative's Manual. It states:
Expired Products
Products which have passed the expiration date must be incinerated or poured down a drain.
Although the trial court did not rule on McNeil's truth defense in granting summary judgment, we deem it appropriate to analyze it for the trial court's benefit on remand. There is little doubt that DeVries received a communication from her employer regarding a shipment of short dated Tylenol. According to DeVries, she was ordered to distribute the expiring product to physicians and their staff with instructions that they were for personal use only and were not to be given to patients. McNeil's contention is that once the expiration date was reached, DeVries should have destroyed the remaining product pursuant to the instruction in its sales manual. Therefore, argues McNeil, distribution by DeVries after the April 30 expiration date was a unilateral act by DeVries in violation of company policy.
After a trial, a jury may determine that McNeil's contention is valid. However, the evidence would also suggest that, in light of the surrounding circumstances, the instruction superceded the manual. DeVries serviced over 200 physicians. The timing of DeVries' receipt of the instructions and the shipment may have reasonably suggested to DeVries that the originator of the instruction was aware that not all of the product would be distributed before the expiration date and that she was impliedly authorized to distribute the Tylenol after expiration, *169 given the fact that the product was safe and was not to be given to patients.
Validity of the truth defense does not turn completely on whether McNeil had a written policy regarding expired product in its manual. The issue is whether DeVries exceeded her authority and acted unilaterally in distributing the expired product, for that is the sting of McNeil's communication with LaPoff. See Lawrence, supra, 89 N.J. at 460, 446 A.2d 469 ("For the defense to apply, however, the truth must be as broad as the defamatory imputation or `sting' of the statement.").
For the same reason, McNeil cannot preserve the summary judgment by relying on a qualified privilege. McNeil contends that it enjoyed a qualified privilege because it had an interest in the subject and pursuant to that interest it made a statement to a person with a corresponding interest. See Jorgensen v. Pennsylvania Railroad Co., 25 N.J. 541, 564, 138 A.2d 24 (1958) (quoting Rothholz v. Dunkle, 53 N.J.L. 438, 440, 22 A. 193 (E. & A. 1891)). However, even if the privilege is applicable, an issue not reached by the trial judge, it may be lost by abuse. See Bainhauer v. Manoukian, 215 N.J. Super. 9, 42-43, 520 A.2d 1154 (App.Div. 1987). Whether McNeil abused the privilege is a jury question. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 565-567, 569 A.2d 793 (1990); Bainhauer, supra, 215 N.J. Super. at 40, 520 A.2d 1154. "[T]he privilege is lost if the speaker knows the matter is false or acts in reckless disregard of its falsity." Bainhauer, supra, 215 N.J. Super. at 42, 520 A.2d 1154. Thus, if the jury finds that McNeil created the false impression that DeVries acted unilaterally, and that McNeil knew that the impression it created was false or acted in reckless disregard of its falsity, then the qualified privilege would not protect McNeil.[3]
*170 We reverse the summary judgment in favor of defendant McNeil on the third count of the complaint.
We affirm, however, the judgment in favor of defendant on plaintiff's cause of action under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980).
We recently addressed Pierce and its boundaries in Hennessey v. Coastal Eagle Point Oil Company, 247 N.J. Super. 297, 303-304, 589 A.2d 170 (App.Div. 1991), where we stated:
In Pierce, the New Jersey Supreme Court recognized that an employee at will has a cause of action for wrongful discharge if "the discharge is contrary to a clear mandate of public policy." Pierce, supra, 84 N.J. at 72, 417 A.2d 505. Although Pierce recognized the cause of action, it affirmed a summary judgment for the employer. Id. at 76, 417 A.2d 505. On the record before it, the Court found that plaintiff, a medical doctor engaged in pharmaceutical research, merely had become involved in "a difference in medical opinion" with her corporate supervisors regarding drug research which was subject to FDA approval and control, and, therefore, it found no violation of public policy in her termination. Id. at 75-76, 417 A.2d 505.
The Pierce cause of action is not unique to New Jersey. Other jurisdictions had recognized a cause of action for discharges violative of public policy, and they were discussed in the Pierce opinion. Id. at 67-70, 417 A.2d 505. In Pierce, the Court stated "[t]he sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions," that "[i]n certain instances, a professional code of ethics may contain an expression of public policy." Id. at 72, 417 A.2d 505.
Recently, New Jersey courts have addressed the application of Pierce. In Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 536 A.2d 237 (1988), the plaintiff alleged that she had been discharged in retaliation for her attempts to determine whether gender discrimination had barred her advancement. Id. at 192, 536 A.2d 237. The Court held that this allegation, if true, would constitute a violation of the public policy established by the Legislature when it adopted New Jersey's Law Against Discrimination. Id. at 192-193, 536 A.2d 237; see N.J.S.A. 10:5-1 et seq.

In Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 538 A.2d 1292 (App. Div. 1988), we held that a retaliatory discharge for having filed a worker's compensation claim supported a civil action for damages, in addition to the statutory remedies of reinstatement, back pay and civil penalty. Id. at 442-443, 538 A.2d 1292; see N.J.S.A. 39:15-39.1 and 39.2. We also held that discharge for having filed a complaint with the Occupational Safety and Health Administration was actionable under Pierce. Id. at 445-446, 538 A.2d 1292. Accord Lepore v. National Tool and Mfg. Co., 224 N.J. Super. 463, 470, 540 A.2d 1296 (App.Div. 1988), aff'd 115 N.J. 226, 557 A.2d 1371 (1989), cert denied, [___] U.S. [___], 110 S.Ct. 366, 107 L.Ed.2d 353 (1989).
*171 On the other hand, we have held Pierce to be unavailable where discharge resulted from disputes which were internal and implicated only private interests. In House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 556 A.2d 353 (App.Div.), certif. denied, 117 N.J. 154, 564 A.2d 874 (1989), plaintiff alleged that he had been terminated because he had complained to his supervisor about the shipment of a product he deemed to be contaminated. We affirmed a summary judgment in favor of the employer, holding that the mere voicing of opposition to corporate policy provides an insufficient foundation for assertion of a Pierce claim. Id. at 49, 556 A.2d 353.
We held in Schwartz v. Leasametric, Inc., 224 N.J. Super. 21, 30, 539 A.2d 744 (App.Div. 1988), that termination of an employee to avoid paying commissions did not violate a clear mandate of public policy. We stated that "a cause of action under Pierce has been recognized if the firing was in retaliation for an employee's refusal to commit an act which would violate a statute or for assertion of a right protected by legislation, or for firings which were `invidiously discriminatory.'" Id. at 30, 539 A.2d 744 (citing Citizens State Bank of N.J. v. Libertelli, 215 N.J. Super. 190, 195, 521 A.2d 867 (App.Div. 1987)).
In Alexander v. Kay Finlay Jewelers, 208 N.J. Super. 503, 508, 506 A.2d 379 (App.Div.), certif. denied, 104 N.J. 466, 517 A.2d 449 (1986), we held that in the absence of a statute or regulation prohibiting discharge in retaliation for a civil suit against the employer arising out of a salary dispute, there was no Pierce cause of action. We noted that "the dispute giving rise to the termination of plaintiff's employment involved a matter having no significance beyond the private interests of plaintiff and defendant." Id. at 508, 506 A.2d 379.
The distinction between personal and public interests guided this court in Warthen v. Toms River Community Mem. Hosp., 199 N.J. Super. 18, 488 A.2d 229 (App.Div.), certif. denied, 101 N.J. 255, 501 A.2d 926 (1985). Plaintiff, a nurse, had refused to dialyze a terminally ill double amputee because of her moral *172 and philosophical objection to performing the procedure under those circumstances. Id. at 21, 488 A.2d 229. She was discharged. Although plaintiff based her refusal on an ethical code for nurses, we held that plaintiff was motivated by her personal morals, precluding application of Pierce. Id. at 28, 488 A.2d 229. We observed that "[b]y refusing to perform the procedure she may have eased her own conscience, but she neither benefited the society-at-large, the patient nor the patient's family. Id. at 28-29, 488 A.2d 229.
We conclude that DeVries' discharge did not violate a clear mandate of public policy. Although it may have been unfair, it implicated only the private interests of the parties. DeVries reinstatement or an award of damages to her for wrongful discharge would not further any public interest or serve to vindicate any identifiable public policy.
Plaintiff relies on the principle of equitable estoppel as the public policy McNeil violated. In support of her contention, plaintiff cites a trial court decision, Crowell v. Transamerica Delaval, Inc., 206 N.J. Super. 298, 502 A.2d 573 (Law Div. 1984). The context of plaintiff's discharge in Crowell resembled the circumstances in the present case. The Crowell court characterized the circumstances in the following terms:
The plaintiff here was led by his supervisor to believe that the manufacturing defect which he ignored was one that the company invited him to ignore. Promptly thereafter Transamerica fired him for accepting its invitation. That conduct is unconscionable. It violates public policy and creates a cause of action in contract, tort or both.
Id. at 306, 502 A.2d 573.
Based on those facts the trial court ruled that the principle of equitable estoppel applied and that "[a]ny conceivable definition of `public policy' as that term is used in Pierce, would have to embrace the concept [of equitable estoppel]." Ibid.
We disagree with Crowell and hereby disapprove of it. Pierce recognized a limited exception to the right of an employer to discharge an at will employee. Pierce, supra, 84 N.J. at 73, 417 A.2d 505 ("If an employee does not point to a clear *173 expression of public policy, the court can grant a motion to dismiss or for summary judgment"). Despite attachment of the equitable estoppel label, the discharge in Crowell, though unfair, like DeVries discharge, involved private, not public, interests. Cf. Erickson, supra, 117 N.J. at 560, 569 A.2d 793 (an employer has an absolute right to discharge an `at-will' employee even if that employee has retained a lawyer to protest the employer's action  provided only that the employer not violate any clear mandate of public policy.").
The summary judgment on counts one and two are affirmed; the summary judgment on count three is reversed and the matter is remanded for further proceedings.
NOTES
[1] Plaintiff's notice of appeal limited the appeal to "the order granting summary judgment to McNeil Consumer Products Co." Accordingly the judgment in favor of defendant Johnson & Johnson, Inc. is not before us.
[2] DeVries also has a nursing degree.
[3] If it is determined that McNeil enjoyed a qualified privilege, then plaintiff must establish its abuse by clear and convincing evidence. Erickson, supra, 117 N.J. at 565, 569 A.2d 793.