969 A.2d 500 (2009)
407 N.J. Super. 63
Karen PETERSEN and Freedom Farms, Plaintiffs-Appellants,
v.
Jane MEGGITT, Denise Blauth, Horse News, Hunterdon County Democrat, Penn Jersey Advance, Tri Town News, the Examiner, and Greater Media Newspapers, Defendants-Respondents.
No. A-4816-07T1
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 2009.
Decided May 6, 2009.
*502 Panitch & Rachinsky, LLC, East Brunswick, for appellants (Richard S. Panitch, of counsel; John J. Rachinsky, on the brief).
Robinson, Wettre & Miller, LLC, Newark, for respondents Jane Meggitt, Horse News, Hunterdon County Democrat, Penn Jersey Advance, Tri Town News, The Examiner, and Greater Media Newspapers (Keith J. Miller, on the brief).
Before Judges CUFF, C.L. MINIMAN and KING.
The opinion of the court was delivered by
C.L. MINIMAN, J.A.D.
Plaintiffs Karen Petersen (Petersen) and Freedom Farms appeal from the July 20, 2007, grant of summary judgment to defendants Jane Meggitt (Meggitt), Horse News, Hunterdon County Democrat, Penn Jersey Advance, Tri Town News, The Examiner, and Greater Media Newspapers (collectively, the media defendants) dismissing the remainder of plaintiffs' defamation complaint against them. At that time, the complaint consisted of four remaining alleged defamatory statements. Two previous interlocutory orders had dismissed other portions of plaintiffs' complaint containing other alleged defamatory statements;[1] however, plaintiffs did *503 not appeal those orders.[2] Thus, we review only the four alleged defamatory statements dismissed on July 20, 2007. The primary issue on appeal is whether the four alleged statements fall within the ambit of the fair-comment privilege. We conclude that they do and affirm.
Meggitt wrote an article entitled "One Horse Dead, Others Seized in New Jersey Neglect Case" that was published in the December 2005 issue of Horse News, Volume 14, Number 9. The article in pertinent part is reproduced below with the statements alleged to be defamatory in paragraphs 25, 29, 31, and 33 of plaintiff's complaint underscored:[3]
UPPER FREEHOLD TWP., NJ Seven thoroughbreds were seized by the New Jersey Society for the Prevention of Cruelty to Animals (NJSPCA) last month from a farm on Route 537 in Upper Freehold Township. On Nov. 19, their owner, Bridgeton resident Denise Blauth pleaded guilty in municipal court to failure to provide proper food for three of the horses kept on the farm. She was ordered to pay $1,000 in fines and $500 in restitution to the NJSPCA for the horses' care.
Blauth owned eight horses kept at Freedom Farm, including a mare who died on Oct. 21 and whose carcass was left to rot in a field for 10 days. Blauth rough-boarded at the farm, which is owned by Karen Petersen. Petersen was not charged in the incident and did not appear at the court hearing. NJSPCA Officer Stewart Goldman [Goldman] said five of the horses have been forfeited to the NJSPCA, and Blauth will be permitted to take two of the horses to her 15-acre farm in Cumberland County, where she will be subject to random NJSPCA inspections. He said the issue came down to money, and a "she said/she said" situation between Blauth and Petersen.
Township Animal Control Officer Mary Klink was the preliminary investigator on the case. She reported at the hearing that a cruelty investigation was conducted on Oct. 22 at the farm, where the seven thoroughbred horses were found emaciated, some near terminal starvation. A bill from Petersen to Blauth in the amount of $10,728 was presented in the case, although there was no evidence presented that Petersen had filed a stableman's lien in order to recoup the money owed her.
Blauth said she would take responsibility for the horses' condition, but felt it was the farm's fault. She said she owed Petersen $1,000 a year ago and wanted *504 to take the horses off the property, but Petersen would not allow the horses to leave until the bill was paid. Blauth claimed that Petersen then put all of the horses, regardless of age or sex, together in one field with no shelter. She says it is possible that the fillies are now pregnant. Petersen did not respond to phone calls, and in an e-mail said she was out of town until later this month.
Goldman said that farm owners should make arrangements for animals in a bad board bill situation if they do not want to assume the burden for their care, and that appropriate action was not taken in this case. The seized animals were examined by veterinarian Dr. Barbara Delaney, Freehold. Goldman said horses on the farm not owned by Blauth looked fine.
....
Petersen would not permit the removal of the dead mare owned by Blauth, a broodmare named Carrie. The township agreed to pay the $350 fee for the carcass removal and will pursue reimbursement from Blauth. The horse had been dead for 10 days when it was finally removed and was being eaten by vultures. Deputy Animal Control Officer John Klink told Petersen the carcass must be removed or buried. M & S Pet Removal, Penns Grove, requires payment up front before picking up the carcass, and Petersen turned the removal truck away when it arrived on Oct. 31. Animal control then got permission from the township to have the horse removed at municipal expense. According to Earl Guilfoyle, who lived at the farm at the time, the mare died on Oct. 21, of unknown causes. He said the mare was lying in the field of the racetrack at the farm, which was used as a horse paddock. Blauth alleged that she had sent someone earlier to remove the horse, but Petersen turned that person away.
With respect to the first defamatory statement, "Petersen would not allow the horses to leave until the bill was paid," plaintiffs alleged that Petersen never made such a statement and that it was Blauth who would not remove her horses. With respect to the second defamatory statement, "Petersen would not permit the removal of the dead mare owned by Blauth," plaintiffs alleged that they wanted the horse removed, but weather conditions made removal impossible. With respect to the third defamatory statement, "Deputy Animal Control Officer John Klink told Petersen the carcass must be removed or buried," plaintiffs alleged that John Klink told Petersen that she could not bury the horse on her property. Finally, with respect to the fourth defamatory statement, "Petersen turned the removal truck away when it arrived on Oct. 31," plaintiffs alleged that the statement was false and "demonstrates the inconsistencies" in the article, specifically "Meggitt falsely claims the horse died on October 21st and remained for ten (10) days, yet claims that the removal truck was turned away on the same day she inaccurately states that the carcass was removed."
In seeking a summary judgment dismissing these defamation claims, the media defendants submitted three certifications from Animal Control Officer Mary Klink, volunteer Animal Control Officer John Klink, and Stuart Goldman, an officer with the NJSPCA. Mary Klink certified that all of the statements attributed to her in the article were true and "fairly and accurately represent statements that [she] made regarding the Freedom Farm matter" and that the report of the municipal-court proceedings, which occurred on November 10, 2005, also fairly and accurately represented those proceedings. More specifically, she certified that she told Petersen *505 "she would have to remove or bury the dead horse. In response, Karen Petersen made a joke about letting the buzzards eat the dead horse. When we left, it was my understanding that Karen Petersen intended to have the dead horse removed from Freedom Farm." She further certified that when she and her husband returned to the farm several days later, the horse was still in the field, had become bloated, and was a health hazard. She continued:
When my husband and I asked Karen Petersen why she had failed to remove or bury the dead horse as we had directed, Ms. Petersen said it was because she would not pay to have the dead horse removed, because it was Denise Blauth's horse.
... When I spoke with M & S Pet Removal Service to confirm that the Township would be paying for removal of the dead horse, the owner of M & S Pet Removal Service (Mark) told me that he had previously been turned away from Freedom Farm by Karen Petersen because she refused to pay for the removal of the dead horse.
John Klink repeated the certified statements made by his wife with respect to the accuracy of the statements attributed to him and the accuracy of the report of the municipal-court proceedings. He added that, when he and his wife went back to the farm and discovered the dead horse still in the field, he "offered to bring a backhoe to Freedom Farm to bury the horse at the Farm, but Ms. Petersen refused my offer." He certified that, when he spoke with Blauth, she said that she had previously sent M & S Pet Removal Service to the farm, but Petersen would not pay for the removal and turned the service away. The accuracy of Blauth's statement was confirmed to John Klink by Mark, the owner of M & S. John Klink certified that, by the time the horse was removed, it had been dead for over one week. Finally, he certified that "Rebecca," one of the trainers at Freedom Farm, told him that "Blauth had previously sent a shipper to remove all of Ms. Blauth's horses from Freedom Farm, but that Karen Petersen had refused to let the horses be removed from Freedom Farm because Ms. Blauth owed Ms. Petersen money for the horses' board."
Goldman certified that he had been in charge of investigating the neglected horses at Freedom Farm in October 2005. Like the Klinks, he certified that all of the statements Meggitt's article attributed to him were fairly and accurately described and that he was not misquoted in any respect. He confirmed that the article in question fairly and accurately commented on the condition of the horses, the municipal-court proceedings, and the investigation he conducted with the Klinks. He also certified that when he questioned Petersen, she "told me that the owner of the horses, Denise Blauth, had previously sent a representative to retrieve the horses but that Ms. Petersen had refused to let the horses be removed from Freedom Farm by Ms. Blauth's representative."
The media defendants also submitted the minutes and a CD recording of the December 13, 2005, Board of Health meeting and the Animal Control records. The latter records contained a bill from M & S for removal of the horse on October 31, 2005, and indicated that the investigation began on October 22, 2005.
In opposition to the summary-judgment motion, Petersen certified that the allegations in the complaint responding to the alleged defamatory statements were all true, that she was never charged with any violation or crime in connection with Blauth's horses, and that she suffered a precipitous decline in her business after *506 the subject article and its progeny were published. In a separate certification, she denied making a joke about buzzards eating the horse carcass, denied saying that she would not pay to have the dead horse removed, and denied that she turn away M & S because she refused to pay for the removal of the dead horse, as Mary Klink certified. She also certified that she never declined an offer by John Klink to bring a backhoe to bury the dead horse, did not refuse to pay up front for its removal by M & S, and did not refuse to let the horses be removed from Freedom Farm because Blauth owed her money for the horses' board, as John Klink certified.
In deciding the motion under review, the judge considered the defense of fair comment to the four disputed statements. First, he found that plaintiffs had failed "to present any evidential materials showing actual malice on the part of the defendants." He also concluded that, in light of the certifications submitted by the media defendants in support of summary judgment, "no reasonable jury would find that the media defendants published these statements with reckless disregard of whether or not [they were] false." He found that "the media defendants investigated the story and accurately quoted their sources. In addition, Jane Meggitt interviewed government officials with direct knowledge of the events. The record is devoid of any indications that Jane Meggitt should have entertained doubts as to the truth or falsity of those statements." He also noted that plaintiffs had not submitted any documentary evidence or certifications from other witnesses to support Petersen's denials. He then granted the media defendants' motion and entered an order to that effect the same day. This appeal followed.
Plaintiffs argue that the trial court erred as a matter of law in granting summary judgment. They assert Petersen's opposing certification demonstrated there were genuine issues of material fact and the judge failed to draw all inferences in her favor. They also maintain that the fair-comment privilege does not apply because they were not involved in the municipal-court proceedings and there was not a legitimate issue of public concern respecting their actions. Even if the privilege applies, they urge that the judge erred because he resolved a credibility issue respecting actual malice against them when it should have been decided by a jury. The media defendants counter that summary judgment was properly granted because the four statements at issue fall squarely within the fair-comment privilege.
When reviewing a summary-judgment determination, we apply the same standard as that governing the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998); Antheunisse v. Tiffany & Co., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). That is, summary judgment is appropriate when "there is no genuine issue as to any material fact ... and ... the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Our Supreme Court has explained that when analyzing "a defendant's motion for summary judgment, we must view the facts in the light most favorable to the plaintiff." DeAngelis v. Hill, 180 N.J. 1, 12, 847 A.2d 1261 (2004) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)). "When the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Ibid. (internal quotations removed).
*507 Summary judgment is "particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern. By discouraging frivolous defamation suits, motions for summary judgment keep open lines of communication to the public on such issues." Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 157, 516 A.2d 220 (1986); see also Costello v. Ocean County Observer, 136 N.J. 594, 605, 643 A.2d 1012 (1994) (noting summary judgment is "an important tool for disposing of non-meritorious lawsuits").
Defamation "imposes liability for publication of false statements that injure the reputation of another." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 765, 563 A.2d 31 (1989). A "defamatory statement is one that is false and `injurious to the reputation of another' or exposes another person to `hatred, contempt, or ridicule' or subjects another person to `a loss of the good will and confidence' in which he or she is held by others." Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988) (quoting Leers v. Green, 24 N.J. 239, 251, 131 A.2d 781 (1957)). In any defamation action, the plaintiff bears the burden of establishing, in addition to damages, that the defendant "(1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff." Feggans v. Billington, 291 N.J.Super. 382, 390-91, 677 A.2d 771 (App.Div. 1996); see also Singer v. Beach Trading Co., 379 N.J.Super. 63, 80, 876 A.2d 885 (App.Div.2005) (stating same). Fault, either negligence or malice, must also be proven. Costello, supra, 136 N.J. at 612, 643 A.2d 1012. While a defendant may attempt to assert the truth as a defense, that defense "does not refer to the truthful republication of a defamatory statement but to the truth of the statement's contents." Lawrence v. Bauer Publ'g & Printing Ltd., 89 N.J. 451, 461, 446 A.2d 469, cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982).
In a summary-judgment motion seeking to dismiss a defamation action, the threshold issue is whether the allegedly defamatory statements "are reasonably susceptible of a defamatory meaning." DeVries v. McNeil Consumer Prods. Co., 250 N.J.Super. 159, 165, 593 A.2d 819 (App.Div.1991). Thus, a court must "scrutinize the language `according to the fair and natural meaning which will be given by reasonable persons of ordinary intelligence.'" Printing Mart, supra, 116 N.J. at 765, 563 A.2d 31 (quoting Romaine, supra, 109 N.J. at 290, 537 A.2d 284). "This question is one to be decided first by the court." Romaine, supra, 109 N.J. at 290, 537 A.2d 284. The reviewing court should view the publication as a whole in assessing the language for a defamatory meaning and "consider particularly the context in which the statement appears." Ibid.
"[I]n cases where the statement is capable of being assigned more than one meaning, one of which is defamatory and another not, the question of whether its content is defamatory is one that must be resolved by the trier of fact." Id. at 290-91, 537 A.2d 284; see also Mosler v. Whelan, 28 N.J. 397, 404-05, 147 A.2d 7 (1958) (If the words in question "are vague or ambiguous or reasonably susceptible of legally innocent as well as defamatory significance, it is for the jury to say ... whether they were understood to be defamatory by the average reader who saw them."). On the other hand, if a published statement is only capable of a defamatory meaning, then it is libel as a matter of law. Romaine, supra, 109 N.J. at 290, 537 A.2d 284. The media defendants *508 do not dispute the proposition that the four statements at issue are defamatory or could reasonably be found by a jury to be so, nor do they dispute that the statements were communicated to other persons, were of and concerning plaintiffs, and damaged plaintiffs' reputation.[4]
However, plaintiffs must also establish that the defamatory statements were false and must establish the requisite degree of fault. Feggans, supra, 291 N.J.Super. at 390-91, 677 A.2d 771. (While a defendant may attempt to establish truth as a defense, as stressed above, that defense applies only to the truth of the statement's content, not to the fact that it may be a faithful republication of a defamatory statement. Lawrence, supra, 89 N.J. at 461, 446 A.2d 469. We need not decide, as the judge did here, whether the evidence on falsity was so one-sided that the media defendants were entitled to prevail as a matter of law. This is so because summary judgment may be appropriate despite falsity if an absolute or qualified privilege relieves the media defendants of liability as a matter of law.
The media defendants contend that New Jersey's fair-comment qualified privilege applies to the allegedly defamatory statements, insulating them from liability. "Generally, the fair-comment privilege provides a defense to a libel or slander action when `the words in question are a fair comment on a matter of public interest or concern,'" even though the words are of or concerning a private individual. Senna v. Florimont, 196 N.J. 469, 484, 486 n. 12, 958 A.2d 427 (2008) (quoting Leers, supra, 24 N.J. at 253, 131 A.2d 781).
Although the First Amendment does not protect such speech, Gertz v. Robert Welch, Inc., 418 U.S. 323, 345-47, 94 S.Ct. 2997, 3009-10, 41 L.Ed.2d 789, 808-09 (1974), the Dairy Stores Court expanded New Jersey's common-law free-speech protections to investigative news stories that addressed matters of public concern, requiring proof of actual malice to impose liability. 104 N.J. at 156-57, 516 A.2d 220. Thus, "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity" in order to prevail in a defamation action. Id. at 151, 516 A.2d 220. In a companion case to Dairy Stores, the Court extended the fair-comment privilege to statements respecting matters of legitimate public interest. See Sisler v. Gannett Co., 104 N.J. 256, 271-76, 516 A.2d 1083 (1986) (analyzing standard of liability for article reporting that a former bank official obtained substantial loans from bank).
Nine years later, the Court characterized the fair-comment privilege as applying to media reports about business activities affecting health and safety as well as highly regulated industries because they "intrinsically implicate[] important public interests." Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 410-12, 655 A.2d 417 (1995), cert. denied, 516 U.S. 1066, 116 S.Ct. 752, 133 L.Ed.2d 700 (1996). The Court then decided the public also has "a legitimate interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern." Id. at 413, 655 A.2d 417. Thus, it concluded that "[w]hen the media addresses those issues," the actual-malice *509 standard applies to even an unregulated business. Ibid. The Court found that "the vital role that investigative reporting plays in conveying that information to consumers justifies the imposition of the actual-malice standard to disclosures by the press that substantially concern allegations of consumer fraud." Id. at 428, 655 A.2d 417.
In Senna, the Court found "a useful formula for determining what constitutes a matter of public concern or interest" in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), which examined the content, form and context of a false report, as well as "the identity of the speaker and the targeted audience." Senna, supra, 196 N.J. at 492-94, 958 A.2d 427 (also noting that greater protections are afforded to media defendants). The Court then summarized the application of the fair-comment privilege requiring proof of actual malice:
When published by a media or media-related defendant, a news story concerning public health and safety, a highly regulated industry, or allegations of criminal or consumer fraud or a substantial regulatory violation will, by definition, involve a matter of public interest or concern. In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. Content requires that we look at the nature and importance of the speech. For instance, does the speech in question promote self-government or advance the public's vital interests, or does it predominantly relate to the economic interests of the speaker? Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience.
[Id. at 497, 958 A.2d 427 (citations omitted).]
The content/form/context analysis is not required in this case because Meggitt's article clearly related to an issue of public health and safety and reported on municipal court proceedings, a matter of public interest or concern. Thus, the judge correctly concluded that the fair-comment privilege applied to the article in question.
In order "to overcome [the fair-comment privilege, plaintiffs] must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." Dairy Stores, supra, 104 N.J. at 151, 516 A.2d 220 (citing Restatement (Second) of Torts § 600 (1965)). In other words, plaintiffs must establish the media defendants acted with actual malice. Senna, supra, 196 N.J. at 496, 958 A.2d 427.
The judge found no reasonable jury could conclude that the media defendants acted with malice:
[T]he record now reveals that the media[] defendants investigated the story and accurately quoted their sources. In addition, Jane Meggitt interviewed government officials with direct knowledge of the events. The record is devoid of any indication that Jane Meggitt should have entertained doubts as to the truth or falsity of those statements.
We find no error in this conclusion. Plaintiffs did not offer any proofs tending to show Meggitt knew about or recklessly disregarded the falsity of the allegedly defamatory statements. Nor do they contest the statements in the certifications to the effect that Meggitt accurately quoted her sources in the subject article. Instead, plaintiffs attack only the accuracy of the statements themselves. That is not *510 enough to show malice; rather, it only concerns the alleged falsity of the statements. Because there is no evidence demonstrating that the media defendants acted with actual malice, the fair-comment privilege requires that we affirm.
Affirmed.
NOTES
[1] Sometime after the complaint was filed, the media defendants moved to dismiss for failure to state a claim. On October 13, 2006, the judge hearing the motion entered an order dismissing the first six defamatory statements alleged in the complaint with prejudice, denying the balance of the motion. The media defendants subsequently moved for reconsideration. On January 2, 2007, the judge entered an order dismissing the remaining alleged defamatory statements with prejudice, with the exception of the statements contained in paragraphs 25, 29, 31, and 33 of the complaint, which are the subject of the order from which plaintiffs now appeal.
[2] In their brief, plaintiffs discuss the allegations contained in paragraphs 11, 13, 15, 17, 23, and 27. Rule 2:5-1(f)(3)(A) requires that the appellant's notice of appeal in all civil actions designate the judgment or part thereof from which the appeal is taken. Although the rule does not expressly so provide, "[i]t is clear that it is only the orders designated in the notice of appeal that are subject to the appeal process and review." W.H. Indus. v. Fundicao Balancins, Ltda, 397 N.J.Super. 455, 458, 937 A.2d 1022 (App.Div.2008) (citing Sikes v. Twp. of Rockaway, 269 N.J.Super. 463, 465-66, 635 A.2d 1004 (App.Div.), aff'd o.b., 138 N.J. 41, 648 A.2d 482 (1994)); see also Pressler, Current N.J. Court Rules, comment 6 on R. 2:5-1(f) (2009) (stating same). Therefore, interlocutory orders not contained in a notice of appeal, and the issues related thereto, are not properly before this court on appeal, Fusco v. Bd. of Educ. of Newark, 349 N.J.Super. 455, 461, 793 A.2d 856 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002), and we will not consider them.
[3] The article misspells plaintiff Petersen's name as "Peterson." We have corrected it throughout to eliminate any possible confusion.
[4] Petersen was a board member of the International Morab Breeders Association, which considered whether she should be asked to resign after the article in question was published, making it injurious to her reputation. See id. at 289, 537 A.2d 284 (a defamatory statement exposes a person to hatred, contempt, or ridicule; injures reputation; or subjects plaintiff to loss of good will and confidence).